[Civ. No. 8768. Third Dist. Oct. 1, 1956.]

CRAG LUMBER COMPANY, INC. (a Corporation), Respondent v. H. C. CROFOOT et al., Appellants.

Spurr & Brunner and Sullivan, Roche, Johnson & Farraher for Appellants.

Morris M. Grupp for Respondent.

SCHOTTKY, J.—Plaintiff commenced an action against defendants, the complaint setting forth two causes of action. The first cause of action alleged in part:

"That within four years last past, in the County of Mendocino, State of California, defendants above named and each of them became indebted to plaintiff on an open book account as and for moneys had and received by the defendants, moneys expended by the plaintiff on behalf of said defendants and moneys paid to said defendants, all at the specific instance and request of said defendants, and each of them, in the sum of THIRTY-EIGHT THOUSAND, TWO HUNDRED THIRTY-SEVEN AND 50/100 DOLLARS ($38,237.50), plus interest at legal rate thereon from the 30th day of April, 1948, to date, all of which was pursuant to a written contract between the parties."

The second cause of action alleged that defendants entered into a written contract with plaintiff, and alleged further:

That by virtue of said contract, plaintiff paid to defendants $31,250 in reliance upon the representations of defendants that said defendants were the then owners of said lands; that but for said representations, plaintiff would not have paid the said sum;

That in further reliance upon the representations, plaintiff proceeded to and did construct a mill at a cost to plaintiff of the sum of $174,000; that defendants knew that plaintiff intended to construct a mill; that but for the representations of defendants, plaintiff would not have built said mill; that defendants knew that if their representations were false and fraudulent said mill would not be worth the sum to be expended;

That in reliance upon the representations of defendants plaintiff cut timber from a portion of said land;

That thereafter plaintiff confirmed the fact to be that defendants did not own the lands and that said defendants knew that they did not own the said timber lands and that said defendants knew their representations with reference to ownership were false and untrue and that said defendants' warranty of title was false, fraudulent, and was knowingly made by them as a fraudulent and false warranty;

That by reason of defendants' false and fraudulent representations, plaintiff was obliged to pay $4,950;

That defendants were placed in a position, by reason of their own wrongful and fraudulent representations, which made performance of the contract (with plaintiff), on their part impossible of performance; that plaintiff was damaged by reason thereof in various items of damages totaling $114,275;

That in doing the things alleged, and in knowingly, falsely and fraudulently representing to plaintiff that they, the defendants, were the owners of the said lands, and in knowingly, fraudulently and falsely warranting title, defendants acted maliciously, illegally, and were guilty of a wanton disregard of the rights and feelings of plaintiff, and by reason thereof plaintiff demanded exemplary and punitive damages against the said defendants.

On the same day that the complaint was filed a writ of attachment was issued, the affidavit therefor alleging: "that the Defendants in the said action are indebted to plaintiff in the sum of Thirty-Eight Thousand, Two Hundred Thirty-Seven & 50/100 Dollars ($38,237.50), of the United States,

over and above all legal set-offs and counter-claims upon a written contract, for the direct payment of money, to-wit: _____ and that such contract was made and is payable in this State, . . .''

After filing the original complaint plaintiff filed an amendment whereby it substituted the Exhibit ''B'' to the original complaint for a different exhibit. A demurrer to the original complaint as thus amended having been sustained, the plaintiff filed the second amended complaint herein upon which the issues were joined at the trial.

The second amended complaint also contained two causes of action, the first alleging that:

''. . . defendants above named became indebted to plaintiff upon an open book account for moneys paid over to and loaned to said defendants and moneys paid on behalf of said defendants, all at the specific instance and request of said defendants, and each of them, in the sum of THIRTY-EIGHT THOUSAND, TWO HUNDRED THIRTY-SEVEN AND 50/100 DOLLARS ($38,237.50), plus interest at legal rate thereon from the 30th day of April, 1948, all of which said money was had or received by the defendants for the use and benefit of the plaintiff.''

The second cause of action set forth the contract between defendants and plaintiff and alleged various items of damages resulting to plaintiff because of defendants' ''breach of said contract in bad faith.''

The defendants' answer, after a general denial of the two counts contained in plaintiff's second amended complaint, set up two affirmative defenses to the first cause of action and three affirmative defenses to the second cause of action.

The affirmative defenses to the first cause of action are (1) that no book account existed between the parties, and (2) that since no book account existed and this is an action on an implied contract, the action is barred by the provisions of section 339, subdivision 1, of the Code of Civil Procedure, the complaint having been filed more than two years after the cause of action arose.

The affirmative defenses to the second cause of action are (1) that plaintiff has irrevocably elected to rescind the contract and is estopped to sue for damages for breach thereof, (2) that the action is barred by the provisions of section 338, subdivision 4, of the Code of Civil Procedure, and (3) that plaintiff, after October 1, 1948, with full knowledge of the

facts, assumed the obligations of defendants under the North Coast contract and is estopped to claim damages herein.

The action was tried by the court sitting without a jury. At the conclusion of plaintiff's evidence defendants made a motion for a nonsuit and the court granted the motion as to count one upon the ground that plaintiff had not proved a book account, but denied the motion as to count two. After the trial had been concluded the court found generally in accordance with the allegations of count two and against the affirmative defenses of defendants, and found that plaintiff was entitled to recover the following items of damages from defendant:

A. $31,250 paid on account of purchase price as provided in contract, Exhibit A to plaintiff's second amended complaint, together with interest at legal rate from April 30, 1948, to the date of judgment.

B. For the sums of $781.25 interest and $313.60 taxes paid by plaintiff to defendants by paying said sums, at the specific instance and request of defendants, to the North Coast Development Company on behalf of said defendants.

C. For the sum of $1,512.95, for the cost of constructing the roads on the lands in question, so expended in preparation to properly enter upon the land, and which sum the court found to be the reasonable expenditure for that purpose.

D. For the sum of $318 spent for surveying the land in preparation to properly enter upon the land, which sum the court found to be the reasonable sum expended for that purpose.

E. For the sum of $44,400, being the appreciated value of the timber on the lands in question and the sum which said timber appreciated from its value on April 29, 1948, to the date of the breach of the contract.

F. For the sum of $40,000, being the depreciation in the value of the mill from its reasonable value prior to the breach as compared with its value after the breach of the contract in question.

Judgment was accordingly entered in favor of plaintiff in the sum of $118,575.80, with interest on $31,250 from April 30, 1948, and defendants have appealed from said judgment and in arguing for a reversal of the judgment make the following major contentions: I. Respondent rescinded the contract, electing to pursue its remedy for restitution, in assumpsit, by levying an attachment, and was forever thereafter debarred from pursuing the remedy for damages for breach of contract; II. Respondent is estopped to maintain this action

by virtue of its breach of the assumption agreement; III. Respondent could not maintain this action because it was first in breach; and IV. The damages awarded are excessive.

Before discussing these contentions we shall give a brief summary of the factual situation, as shown by the record and as found by the trial court, bearing in mind the familiar rule that where there is a conflict in the evidence such conflict must be resolved in favor of respondent.

On April 8, 1948, North Coast Development Company (hereinafter referred to as North Coast), through S. Orie Johnson, sales agent for North Coast, in consideration of $10,000, gave H. C. Crofoot an option to buy certain timber lands, in which were included the lands in controversy here. Crofoot gave North Coast his check for $10,000, payment of which was refused upon presentation to the bank. Under date of April 15, 1948, Johnson notified Crofoot to return the option, and this was done by Crofoot on April 20, 1948.

On April 21, 1948, Mr. Lessard, as president of plaintiff, Crag Lumber Company, paid Crofoot $10,000 as a deposit on the purchase price of the land in question, for which Crofoot Lumber Company (hereinafter referred to as Crofoot) gave a receipt which read in part as follows:

"The Crofoot Lbr. Co. guarantees 25 Million feet of Redwood and Fir timber. Approx. 80% Redwood, 20% Fir and all right of way to said timber guaranteed.

"The stumpage price for said timber to be at the rate of $3.75 per thousand."

During the negotiations Crofoot was told that the land and timber were being purchased for operating purposes, and that Crag planned on building a mill, to saw lumber for sale.

Under date of April 29, 1948, Crofoot (first party) as seller, and Crag Lumber Company (hereinafter referred to as Crag) as buyer, executed a contract (the one in litigation, and hereinafter referred to as Contract 1) for the sale and purchase of certain lands situated in the "Dago Creek Area," in Mendocino County, for $93,750, or $3.75 per thousand feet, Spaulding Scale, for the redwood and fir timber on the land, whichever of the two amounts is the greater, but in any event not less than $93,750, as a guaranteed minimum payment.

Said contract represents that "first party [Crofoot] owns certain lands described in Exhibit 'A', attached hereto . . ." and "first party hereby warrants his said title to said lands and timber situated thereon. . . ."

Payment of the purchase price was to be made as follows: $31,250 upon the execution of the contract, receipt of which was admitted. "This amount shall be applied as the last payment due under the terms of this paragraph, and *shall be held* [emphasis added] by the first party as a guarantee for the faithful performance of this contract by second party." The balance was to be paid in three installments of $20,833.34 each, on the 29th day of April of 1949, 1950, and 1951, together with interest at the rate of two and one-half per cent (2½%) per annum on the deferred payments.

Crag, inferentially, was given the right to enter upon the land and cut, but "before beginning the *removal* (emphasis added) of timber from any forty (40) acre tract, described in Exhibit A, to make complete payment in advance therefor to first party on the basis of the Donohoe estimate set forth in Exhibit A." Upon payment of $93,750 Crofoot was "to convey to second party, by a good and sufficient deed, all the real property described in Exhibit A," with certain reservations of hardwood, and certain other timber.

At the date of this contract Crofoot had no interest in the land or timber which he had agreed to sell to Crag. He had been negotiating with North Coast, and an oral agreement for the purchase of the land and timber in question had been reached, but no contract had been executed.

Thereafter, a contract dated April 28, 1948, was executed on May 10th, following. In this contract (hereinafter referred to as Contract 2) Crofoot, the purchaser, agreed to pay North Coast, the seller, $80,000, in three installments of $10,000 each, on or before October 1, 1948, January 1, and March 1, 1949, respectively, and four payments of $12,500 each, payable on or before June 1, September 1, and December 1, 1949, and April 1, 1950, respectively.

With respect to cutting and removing timber this contract provided:

"It is distinctly understood that while the Parties of the First Part may enter upon said property under this Agreement, that the said Parties of the First Part shall not remove any timber from any of the property covered by this Agreement, except as hereinafter specified. Should Parties of the First Part desire to remove the timber from any group or subdivision as mentioned in 'Exhibit A,' said Parties of the First Part shall first notify in writing, deposited in the United States mails by postage prepaid addressed to North Coast Development Company, 2400 Warring Street, Berkeley 4,

California, the group or subdivision which said Parties of the First Part desires to cut. Before any *cutting is done* [emphasis added] Parties of the First Part shall make payment for each group or subdivision named in the written notice in the amount specified in 'Exhibit A' for the particular group or groups mentioned; such payment or payments shall apply against the sums agreed to be paid as specified in Paragraph 2 hereof.''

With respect to the sale of any of said lands, the contract provided:

''Said Parties of the First Part shall have the right to sell any of the property mentioned in 'Exhibit A' subject to the other terms of this Agreement provided first that the amount is paid to the Party of the Second Part for the group desired to be sold as specified and in the amount specified in 'Exhibit A.' ''

The provisions of the contract concerning default in payments are as follows:

''In case of default of any indebtedness, either of principal, interest, or otherwise, due hereunder, the maturities of the entire balance of all amounts payable hereunder shall be accelerated and such balance shall become due within thirty days following date of mailing postage prepaid of written notice from Party of the Second Part addressed to Parties of the First Part at Redwood Valley, California.''

A third contract, dated April 28, 1948, was executed on May 8, 1948, wherein North Coast agreed to sell, and Crofoot to buy, 742 acres of land and timber, outside of the Dago Creek area, at a price of $49,250, of which $25,000 was paid upon the execution of the contract, and the balance payable in three installments, two of $9,000 each, due on the first days of June and July, and the third of $6,250, due on August 1, 1948. It is to be noted that the initial payment of $25,000 was made from the Crag payment of $31,250 on Contract 1. The full price was paid by September 8, 1948, and the land deeded to Crofoot.

Following the execution of Contract 1, Crag secured a mill site, built a mill at a cost of approximately $130,000; had the land surveyed at a cost of $318; constructed logging roads on the property at a cost of $1,512.95; brought in loggers, logging equipment, and began felling timber preparatory to milling it.

By October 1, 1948, Crag had felled about 950,000 feet of timber, and Lessard, president of Crag, received word from Johnson, the sales agent for North Coast, to call and see him.

At the conference between these two gentlemen Lessard learned for the first time that Crofoot did not own the property and had therein only the rights given by Contract 2, by which he was required to pay in advance before any timber was felled, and permitted to sell only land for which he had paid in full. At that time Lessard was notified by Johnson to stop cutting timber until some settlement was made, and thereafter Crag withdrew from the land and did no more cutting.

The payment of $10,000, due October 1, 1948, on Contract 2 was not made by Crofoot, and pursuant to the acceleration clause in that contract North Coast wrote Crofoot on October 4, 1948, as follows:

"Under your timber purchase agreement No. 2 with us dated April 28, 1948, payment of $10,000.00 was due October 1, 1948.

"Inasmuch as the October 1 payment has not been received, your contract is now in default, and all unpaid balances are now due and payable, as provided in Section 8 of said purchase agreement, as follows:

| $10,000. | due October 1 |
|---|---|
| 70,000. | balance of contract |
| 1,600. | interest to November 1 |
| 81,600 | total due" |

Under date of October 18, 1948, Mr. Johnson wrote Crofoot as follows:

"On October 5 you came to this office asking for an extension of time on your Purchase Agreement No. 2 dated April 28, 1948 with the North Coast Development Company, on which nothing has been paid, and concerning which that company sent you under date of October 4, 1948 official notice that the contract was in default.

"At that time you assured us that you could pay $10,000 against this contract not later than the following Monday, October 11, and that you would like to have the January 1 and March 1 payments of $10,000. postponed until April 1, 1949, at which time you would pay $20,000, and meet the other payments as specified in the contract. The way we left the matter was that you should send in the $10,000 as soon as possible, and we would take the matter up with the officers of the North Coast Development Company, and see what arrangements could be worked out. To date we have heard nothing further from you.

"When you were in our office you assured us that the

property under contract had not been jeopardized in any manner. I told you it was my understanding that Mr. Lessard had paid you a substantial deposit against this property. You admitted he had paid you $25,000 against a contract to furnish him 25 million feet of stumpage, and although you expected to fulfill your obligation to Mr. Lessard by furnishing him the timber on this North Coast contract, that you were not obligated to deliver him this specific property.

"Mr. H. C. Crofoot 2: 10-18-48

"Recently Mr. Lessard came to see us, and stated he had paid you $31,000., and had an agreement with you to purchase the North Coast property on Dago Creek, which is the property covered by your Agreement No. 2 with the North Coast Development Company, and that another payment of $20,000 would be due you January 10, 1949. Mr. Lessard also admitted he had cut 300,000 to 400,000 feet of timber on the 40 near Hendy Grove, presumably the NE $\frac{1}{4}$ of the NE $\frac{1}{4}$ of Section 23, Township 14 N, Range 15 W, although he did not give us the legal description of the 40 on which he had cut. If this is the case, you are in additional default of $4,950.00—under the terms of your contract with North Coast, Group 8 of Exhibit A."

It appears from the testimony of Miss Schellenger, secretary of North Coast, who was present at the conference of October 5, 1948, between Johnson and Crofoot, that Crofoot told Johnson he had not agreed to sell Crag the timber in Dago Creek area but only to furnish it 25,000,000 feet. This, in spite of Contract 1.

Pursuant to the suggestion of Johnson in his letter of October 18, 1948, a meeting of Crofoot, Lessard and a North Coast representative was held at the office of Mannon and Brazier in Ukiah, California, on October 30, 1948. At that conference Crofoot agreed to deliver to Mannon and Brazier, on or before November 4, 1948, a cashier's or certified check, payable to North Coast, for $11,913.60, in payment of the following items: $1,600 interest to October 28, 1948, on $80,000 (the purchase price specified in Contract No. 2), $10,000, installment of principal which accrued October 1, and $313.60, the first installment of taxes. Crag agreed to pay within 15 days $4,950 for the timber cut on the land, to be applied as a credit on the January 1st installment of $10,000, to accrue on Contract Number 2.

None of these payments were made within the times specified, but about December 1, 1948, North Coast was paid $11,913.60 by Crofoot, of which $1,094.85 was advanced by Crag. This advance covered $313.60 for taxes, and $781.25 interest for six months at two and one-half per cent (2½%) on the balance of the Crag-Crofoot contract. On December 21st Crag paid North Coast $4,950 for the timber trespass, which was credited on the installment of $10,000 to accrue January 1, 1949, on the North Coast-Crofoot contract, leaving a balance of $5,050 to be paid by Crofoot on the date last mentioned.

Sometime during November, 1948, the exact date of which is not fixed by the evidence, H. C. Crofoot, Sr., and Mr. Lessard had a meeting in Ukiah, at which one of the topics discussed was the course which the payments from Crag to Crofoot were to take. Lessard told Crofoot that in the future he would like to make those payments direct to North Coast, undoubtedly for the purpose of channeling them to the owner so that they could not be diverted by Crofoot for some other purpose. According to Crofoot, it was agreeable to him, and from that time on he paid no attention to the payments accruing on that contract as he considered that Crag had assumed his obligations thereunder.

Under the terms of the North Coast-Crofoot Contract 2, $10,000 was to be paid on January 1, 1949. On December 21, 1948, Crag had paid $4,950, which was credited against this installment, leaving a balance of $5,050. By January 5th Crofoot had not paid that balance, and a reminder was sent to Crofoot. Under date of January 8, 1949, Earl Sherman, for Crofoot, wrote that ''Mr. Crofoot is feeling much better now and is able to be up and around and has asked me to inform you that he will be able to come down to see you January 14th.''

Payment of the above mentioned balance not having been made by January 17th, a registered letter was sent by North Coast to Crofoot, reminding him of the failure to pay and advising that principal of $65,000 and interest in the amount of $433.66 were immediately due.

Under date of February 28, 1949, B. M. Schellenger, secretary of North Coast Development Company, wrote Crofoot as follows:

''Inasmuch as we have not received the check, which you assured us would be in our hands not later than Wednesday of last week, we have no recourse but to place your defaulted

contract in the hands of Mannon and Brazier, Ukiah, California. The file is going forward to them today. We ask that you communicate with Mr. Brazier, instead of this office, in connection with all matters relating to this contract."

To this letter, under date of March 10, 1949, Crofoot replied as follows:

"I have been meaning to get in touch with you, but I haven't been feeling to well again, and unable to do anything. The lumber business has been bad as I guess you know.

"I had a chance to sell the Mill and Timber in the Orr Springs, area. I am going to close up the deal on the 18th as you can see by the attached notice. The timber I have to let go on a cutting basis which will work out in a term of years.

"Mr. Lessard came down and I guess he is having some delays on his loan but felt sure it would be through by the 1st. He said he would be able to take care of his payment at that time. I will take care of the balance of the payment on closing this mill deal."

No further payments were made, and in an attempt to save the situation Crag made an offer to Crofoot to assume and pay the balance of Contract 2 in full, if Crofoot would pay $16,664.60, the amount of the delinquent interest and principal. As a memorandum of the proposed agreement, Lessard prepared, executed for Crag, and left with Crofoot, the following:

"April 27th, 1949

"1. Crofoot agrees to assign North Coast Dev. Co. contract #2 (Dago Creek) to Crag.

"2. Crofoot agrees to furnish prior to May 15, 1949 the sum of $16,664.60 to be paid to North Coast Dev. Co. in order to bring said contract up to date.

"3. Crag agrees to assume and pay balance of said contract in full.

"4. Balance due under Crofoot-Crag contract to be paid quarterly commencing July 1, 1949 (12500 each), other wise terms to remain in effect.

"5. Crag to receive credit on Crofoot-Crag contract for all sums paid or to be paid on North Coast-Crofoot contract (Dago Creek) by Crag.

"Crag Lumber Co. Inc.
"By Ed Lessard Pres."

This agreement was never executed by Crofoot and Crag did not pay the installment of $20,833.44 due on contract

Number "1" on April 29, 1949, and the Crofoots did not make the payment to North Coast which was necessary to relieve them from default under their contract with North Coast, and sometime later, the exact date of which is not shown by the evidence, the "Dago Creek lands" were sold by North Coast to a third party.

The record shows that on November 21, 1950, a letter was written to North Coast by R. K. Shore, a certified public accountant, stating that H. C. Crofoot had retained him to audit his affairs for the past three years and stating that Crofoot's records contained certain data that he (Shore) wished to verify. A part of the letter stated: "Contract #2, being in default, was revoked and the entire $14,950.00 paid by Mr. Crofoot forfeited in March 1949." At the end of the letter was the statement: "You are hereby authorized to comply with the above request," signed by H. C. Crofoot.

Appellant H. C. Crofoot testified that defendants had between $60,000 and $70,000 in two banks, and at any time could have paid any outstanding obligations. For failing to pay North Coast, he offered the excuses that he did not know that the North Coast contract was in default, and that Crag had agreed to make the payments on that contract, that he paid no further attention to it, and assumed that the payments had been made.

Appellants' first major contention is that respondent rescinded the contract between appellants and respondent by electing to pursue its remedy for restitution upon an implied contract by levying an attachment, and was thereafter debarred from pursuing the remedy for damages for breach of contract. In support of this contention appellants assert: (a) The pursuit of the remedy for restitution, by count one of the original complaint, constituted a rescission of the express contract between the parties; (b) the attachment obtained by respondent was based on count one of the original complaint; (c) by obtaining the levy of an attachment, respondent elected to pursue its remedy for restitution upon implied contract.

Appellants argue that in an action based upon a breach of contract, the injured party has the election to pursue either the remedy of restitution treating the contract as rescinded and suing to recover what he has paid, or sue for damages, but that he cannot do both. They cite *Boshes* v. *Miller,* 119 Cal.App.2d 332, a case involving a breach of contract, where the court said at page 337 [259 P.2d 447]:

". . . He could have treated the contract as rescinded because of defendants' breach, and sued for the amount by which defendants had been unjustly enriched, or he could have stood on the contract and sued for damages resulting from the breach. He could not do both, and if he recovered on one theory he could not recover on the other. He could not take out his money, which was the consideration for the contract, and at the same time enforce the contract. As long as the contract had not been modified, superseded or rescinded his action was on the contract."

Appellants also state that it is the settled law in California that when a plaintiff, in pursuit of one of several inconsistent remedies, obtains an attachment, he gains an advantage over his adversary and that act constitutes an irrevocable election to pursue that remedy. They quote the following from *Steiner* v. *Rowley,* 35 Cal.2d 713, at page 720 [221 P.2d 9]:

"Concerning the effect of the writ of attachment obtained by the Steiners, the doctrine of election of remedies is based upon the principle of estoppel. 'Whenever a party entitled to enforce two remedies either institutes an action upon one of such remedies or performs any act in pursuit of such remedy, whereby he has gained an advantage over the other party, . . . he will be held to have made an election of such remedy, and will not be entitled to pursue any other remedy for the enforcement of his right.' (*DeLaval Pac. Co.* v. *United C. & D. Co.,* 65 Cal.App. 584, 586 [224 P. 766].) . . .

"An action for tort in which exemplary damages are sought is inconsistent with one for money had and received. (Civ. Code, § 3294.) The Steiners were therefore required to make a timely election of remedies. Pleading the two causes of action in the alternative did not constitute an election because inconsistent counts are permissible [citing cases] and an election cannot be forced by demurrer [citing case]. But the Steiners also obtained an attachment. This was a positive act of a plaintiff 'in pursuit of . . . [the contractual remedy] . . . whereby he has gained . . . advantage over the other party. . . .' (*DeLaval Pac. Co.* v. *United C. & D. Co.,* 65 Cal. App. 584, 586 [224 P. 766].)"

Respondent in reply argues that the attachment was not issued upon an implied contract; that there was no action on implied contract filed, and respondent points out that the affidavit for attachment states specifically that the attach-

ment was based "upon a written contract for the direct payment of money."

The record shows that after the filing of the second amended complaint and before trial, appellants moved the trial court for an order declaring that respondent, by obtaining an attachment, had elected to pursue its remedy upon an implied contract for restitution, and to dismiss Count Two upon the grounds that respondent, having elected to pursue its remedy for restitution, was debarred from seeking damages for breach of contract. Respondent filed an affidavit in opposition to said motion, alleging, among other things, that the attachment was not based upon Count One of the original complaint but was based on various items of damage suffered by respondent because of appellants' breach of the written contract, incorporated as Exhibit "A" in the second cause of action.

It is to be noted that the affidavit for attachment does not refer specifically to either cause of action but does state that it was based upon a written contract. It is apparent also that respondent was seeking to recover damages suffered by it because of appellants' alleged breach of contract. It is true that the amount set forth in the affidavit for attachment and in the writ of attachment was $38,237.50, the same as the amount set forth in the first cause of action, but it is also true that this sum of $38,237.50 includes more than the sum of $31,500 which respondent had paid to appellants under the contract, and includes the sums of $4,950 paid by respondent to North Coast Development Company on behalf of appellants; $1,300 spent to construct necessary roads on the land; $512.50 for rights of way which under the contract were to be provided by appellants; and $225. In this state of the record we do not believe that the trial court erred in denying appellants' motion to dismiss Count Two upon the ground that respondent was debarred from seeking damages for breach of contract. ■ As stated in *Steiner* v. *Rowley, supra,* and quoted by appellants: "Concerning the effect of the writ of attachment obtained by the Steiners, the doctrine of election of remedies is based upon the principle of estoppel."

■ The record shows further that after the conclusion of the trial in which a nonsuit had been granted as to Count One, but before the case was decided by the trial court, appellants made a motion to dissolve the attachment upon the ground that it was based upon Count One as to which the nonsuit had been granted. After a full hearing at which all of the exhibits which were before the court at the trial

were introduced in evidence, the court denied said motion.

The court also, in its findings as to the affirmative defense of appellants to the second cause alleging that respondent had irrevocably elected to rescind the contract and was estopped to sue for the breach thereof, found substantially as follows:

That it is not true that by the first cause of action of the original complaint plaintiff sued upon implied contract; that plaintiff sued on an open book account alleging that the sum sued for was "pursuant to a written contract" but did not refer to any specific contract; that Exhibit "A" was for the first time referred to and incorporated into the complaint by the second cause of action, which seeks to recover damages for the breach of Exhibit "A" to the second amended complaint; that upon the filing of the original complaint, plaintiff obtained the issuance of a writ of attachment and the defendants' bank account has ever since been held under levy; that the issuance of the attachment was not based upon the first cause of action of the original complaint, but was based on the sum alleged due under a written contract as set forth in the "Affidavit for Attachment Against Resident"; that thereafter plaintiff filed a second amended complaint prior to any motion to dismiss the attachment and thereafter upon defendants' demand a bill of particulars was filed by plaintiff, setting forth the items allegedly constituting the items of the book account, the basis of the first cause of action; that no combination of said items constitutes or equals the amount for which the attachment was issued; that the second cause of action based upon the written contract, Exhibit "A," contained, among others, six items of damages which totaled the exact amount of the attachment and the exact amount referred to in the "Affidavit for Attachment Against Resident" and under said second amended complaint, the only count which contained a written contract as set forth in the said affidavit was the second count; that the attachment being so issued on the basis of the affidavit setting forth therein that the same was based upon an indebtedness arising out of a written contract was based upon the second cause of action and not upon the first cause of action.

While it must be stated that the record shows a somewhat unusual and confusing situation so far as the pleadings are concerned, we do not believe that either reason or authority would justify us in holding that the issuance of the attachment in the instant case constituted an irrevocable election to rescind the contract or to estop or debar respondent from

proceeding with the second cause of action for breach of contract. It is evident that what respondent was seeking to do was to recover alleged damages for breach of the contract and it would be an extremely technical and unrealistic construction of the authorities to hold otherwise.

■ Appellants' second major contention is that respondent is estopped from maintaining this action by virtue of its breach of the assumption agreement. Appellants contend that when respondent, in October of 1948, advised appellants that it would assume the payment obligations of the North Coast contract, with full credit for what had already been paid and with adjustment upon the final cut, which is supported by all of the subsequent conduct of the parties, and thereafter failed to make such payments, respondent became estopped from asserting the failure to make such payments by appellants as the cause for alleged damages. With reference to the fact that the so-called assumption agreement was not in writing, appellants argue that it would be a fraud upon them to allow respondent to assert the statute of frauds with reference to it. It appears from the record that nearly 17 months after filing their answer to respondent's second amended complaint, appellants filed an amended answer in which they for the first time set up the defense that respondent, with full knowledge of appellants' contract with North Coast, "promised and agreed with defendants to assume and pay the future payments under said contract and defendants promised and agreed to credit such payments as they were made upon the contract between plaintiff and defendants referred to as Exhibit A in plaintiff's Second Amended Complaint," and that "Thereafter, and relying upon said promise and agreement aforesaid, said defendants, and each of them, made no further payments to said North Coast Development Company but depended and relied upon said plaintiff to make said payments as they became due for its own protection and to take credit therefor upon its said contract with defendants."

Respondent points out that the trial court found that these allegations were not true, and asserts correctly that this issue is a factual one and that the trial court's findings upon it are supported by the record. We have read the record and the exhibits carefully and the evidence upon this issue is highly conflicting. It resolved itself very largely into a question of whether the court believed the testimony of appellant Crofoot or Mr. Lessard, president of Crag Lumber Company, and the court evidently chose to disbelieve the testimony of Crofoot.

We are satisfied that there is support in the record for the court's finding upon this issue. There appeared to be a willingness upon respondent's part to assume the payments under Crofoot's contract with North Coast if Crofoot complied with certain conditions and made certain payments. This is indicated by the following excerpt from Lessard's testimony quoted by appellants in the supplement to their opening brief:

"I told him that if this thing were brought up to date and everything was cleaned up, that we could make future payments, if he would turn the contract over to us, but with full credit for the moneys already paid, and that the $80,000.00 contract [North Coast-Crofoot contract] was to be thrown aside." But there is testimony to support a finding that appellants did not make such payments or perform said conditions.

Appellants' third major contention is that respondent could not maintain this action because respondent was first in breach of its contract with appellants. Appellants contend that respondent has been guilty of three breaches of its contract, which are: (1) failure to make its payment under the terms of the contract when it became due on April 29, 1949; (2) failure to pay for the stumpage on the 40-acre section from which it removed timber "before beginning the removal"; and (3) its failure to account to appellants for the exact stumpage removed from said 40 acres and pay the difference between the advance payment called for under its contract and the amount due based on the actual removal. The default with regard to the second point only was cured. Appellants argue that $16,978.19 was due from Crag to Crofoot on April 29, 1949, which was more than was due from Crofoot to North Coast, but for the acceleration of payments, and that North Coast was willing to waive the acceleration had the $16,978.19 been paid.

Appellants contend further that there was no anticipatory breach on April 29, 1949, which would excuse Crag's duty to perform its obligation under the contract and make the payment due. They argue that even though they may have been in default, it was not *impossible* for them to perform their contract with respondent, as they *might* have reinstated their contract with North Coast.

Respondent in reply argues that appellants' contention that respondent was first to breach the contract cannot be sustained. They state that respondent could not reasonably be required to make a payment to appellants on April 29,

1949, which was two months after appellants' contract with North Coast was forfeited and terminated, and the Crofoots had been in breach of the Crag-Crofoot contract in failing to protect Crag's rights to cut and remove timber, its rights to possession and its ultimate right to get title. They state further that these present rights were the most important part of the contract and from the very outset Crofoot was in breach because respondent was given a right to cut trees without paying for them "until *before 'removal'* "; that appellants gave away something they did not have, unless they first met a condition precedent, to wit: pay North Coast *before* respondent *cut*. They point to the testimony that when North Coast learned of respondent's entry, it instructed respondent not to cut any more timber on their property; that Crofoot did more than "indicate" that "he will not perform," and he did more than render "substantial performance apparently impossible," either one of which is all that is needed for anticipatory breach; he rendered substantial performance impossible.

It is apparent from the record that there is a sharp conflict in the evidence upon this issue but we are convinced that the record supports the finding and conclusion of the trial court that respondent was not guilty of any breaches of its contract with appellants but that appellants by failing to make the payments under their contract with North Coast were responsible for the forfeiting of their contract with North Coast, thus rendering it impossible for them to perform under their contract with respondent. Appellants have pointed to testimony which would have sustained a finding in their favor, but the trial court was not bound to find in accordance with this testimony in view of the testimony in conflict with it.

Appellants' next contention is that if respondent is entitled to any damages at all (and appellants have contended most earnestly that they are not), the amount of damages awarded is excessive.

In their opening brief appellants contend that the amount of damages to which respondent is entitled (if at all) is limited by section 3306 of the Civil Code which reads:

"The detriment caused by the breach of an agreement to convey an estate in real property, is deemed to be the price paid, and the expenses properly incurred in examining the title and preparing the necessary papers, with interest thereon; but adding thereto, in case of bad faith, the difference between the price agreed to be paid and the value of the

estate agreed to be conveyed, at the time of the breach, and the expenses properly incurred in preparing to enter upon the land.''

Respondent in its brief states:

''But, conceding for a moment that it was not a proper item under Section 3306 of the Civil Code, respondent cannot accept appellants' interpretation, that no other damage is recoverable in this action other than those allowed under Section 3306 of the Civil Code.

''As we have heretofore pointed out, the Crag-Crofoot contract *is more than a contract to convey land.* The land values were of little significance to the parties themselves.''

Appellants in their closing brief state:

''This cause was pleaded and tried and the judgment of the trial Court rendered upon the theory that the contract involved was one for the conveyance of real property and the measure of damages provided in Section 3306 of the Civil Code was applied. It was and is the contention of appellant that the contract was not one for the sale and conveyance of real property and the measure of damages for a breach is that provided in Section 3300 of the Civil Code. The Court committed reversible error in adopting the measure of damages expressed in Section 3306 rather than Section 3300 of the Civil Code for which reason the judgment should be reversed and a new trial had so that the proper measure of damages, if any, will be applied.''

Section 3300 of the Civil Code reads:

''For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.''

Appellants' principal attack upon the damages awarded by the court is upon the item of $40,000 for depreciation in the value of the mill. In their opening brief appellants argue that such damages are not provided for by section 3306 of the Civil Code, and in their closing brief appellants argue that the court committed reversible error in adopting the measure of damages expressed in section 3306 rather than in section 3300 of the Civil Code.

It is apparent that there was doubt in the minds of counsel and the court as to which section or sections entitled respondent to recover damages, but it is also clear from the record

that what was at issue in the instant case was whether or not appellants had breached their contract with respondent and, if so, what damage had resulted to respondent by reason of such breach. As we have hereinbefore pointed out, the record supports the findings of the trial court that the appellants, by failing to make the payments under their contract with North Coast, were responsible for the forfeiting of their contract, thus rendering it impossible for them to perform under their contract with respondent. The following statements of the trial court in its order for findings are supported by the record:

"[Appellant] H. C. Crofoot, testified that defendants had between $60,000.00 and $70,000.00 in two banks, and at any time, could have paid any outstanding obligations. For failing to pay North Coast, he offered the excuses that he did not know that the North Coast contract was in default, and that Crag had agreed to make the payments on that contract, that he paid no further attention to it, and assumed that the payments had been made. Neither of these excuses carry any weight, when considered in the light of the other evidence in the case.

"From the very outset, Crofoot was in breach of Crag contract, by selling timber to be paid for on *removal*; when their right, and this acquired after the execution of Contract No. '1,' was to cut the timber only after notice in writing had been given to North Coast, and payment in advance made for the timber to be cut. Of the deposit made by Crag, to *'be held . . . as a guarantee for the faithful performance,'* of the contract, $25,000.00, was used by Crofoot, not as a payment on the contract in question, but applied on the purchase of other lands, for which payment in full was made, by September of 1948, and those lands conveyed to Crofoot.

"Under the facts of this case, no conclusion, other than [that] the breach was wilful and the product of bad faith, can be reached."

After finding as to the various items of damage hereinbefore set forth, the court concluded:

"That the acts and omissions of the defendants as found by this Court in the findings of fact constitute a breach, in bad faith, as of February 28, 1949, of the contract, Exhibit A to plaintiff's second amended complaint; and by said acts and omissions defendants wilfully placed themselves in a position under which they could not then or ever carry out the terms and conditions of said contract, Exhibit A to plaintiff's

second amended complaint, on their, defendants', part to be kept and performed.

"That by reason of the defendants' breach of the said contract wilfully and in bad faith, the plaintiff suffered damages and is entitled to judgment against the defendants and each of them, therefore, as follows:"

Even if we adopted the contention of appellants made in their closing brief, with which respondent agrees, that the proper measure of damages is that provided in section 3300 of the Civil Code, which is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby" (see *Kline* v. *Guaranty Oil Co.*, 167 Cal. 476 [140 P. 1]), respondent could not recover both the appreciation in the value of the timber and the depreciation in the value of the mill. To permit recovery of both would exceed the statutory limit. (Civ. Code, § 3300.) The depreciation in the value of the mill was not a loss suffered by respondent by reason of the breach. Not only such decrease in value, but the total depreciation of the mill, would have been borne by respondent if the contract had been fully performed. A proportionate part thereof would have been chargeable as a necessary expense against the anticipated profits to be realized from the contemplated use of the timber. To permit recovery of the depreciation of the value of the mill, as well as the increase in the value of the timber, would unjustly enrich respondent. Monetarily, it would be in a better position than if the contract had been fully performed. It would receive an amount in excess of that which would compensate it for the loss proximately caused by the breach. Thus, even under section 3300, respondent could not be awarded damages for both the increase in the value of the timber and the amount of the depreciation of the mill. Moreover, we do not believe that in this case the proper measure of damages is that provided for in section 3300. The trial court's finding that the appellants wilfully and in bad faith breached the contract supports an award for those items of damags specified in section 3306 of the Civil Code. Although, as the parties contend, the timber was the important thing for which they were contracting, nevertheless appellants agreed to convey title to the real property after the completion of the installment payments provided for in the contract. Therefore, the rule announced by this court in *Palmer* v. *Wahler*, 133 Cal.App.2d 705, 711 [285 P.2d 8], is inapplicable. We therein declared that "standing timber *purchased separately*

*from the land* under a contract for severance, thereby becomes personalty for all purposes depending upon the contract of purchase.'' (Emphasis added.) In the instant case, under the terms of the contract, the respondent was to receive title to the real property, as well as to the timber. The contract did not cease to be one to convey title to real property by reason of the fact that the main purpose for the purchase of the realty was to obtain the timber standing thereon. · The trial court found that the appellants, in bad faith, breached the contract. Section 3306 provides:

''The detriment caused by the breach of an agreement to convey an estate in real property, is deemed to be the price paid, and the expenses properly incurred in examining the title and preparing the necessary papers, with interest thereon; but adding thereto, in case of bad faith, the difference between the price agreed to be paid and the value of the estate agreed to be conveyed, at the time of the breach, and the expenses properly incurred in preparing to enter upon the land.''

Thus, under said section respondent was entitled to recover the amount paid upon the purchase price ''and the expenses properly incurred in examining the title and preparing the necessary papers, *with interest thereon.*'' (Emphasis added.) In addition, due to appellants' bad faith, the award properly included the amount of the increase in value of the timber (Civ. Code, § 3306; *Nelson* v. *Fernando Nelson & Sons,* 5 Cal.2d 511, 517-518 [55 P.2d 859]) and ''the expenses properly incurred in preparing to enter upon the land.'' (Civ. Code, § 3306.) However, interest is not allowable upon such items of special damages. (*Boshes* v. *Miller, supra,* at pp. 336 and 337.) The statute (§ 3306) does not so provide. Neither does it authorize an award for damages for the depreciation in the value of the mill.

We have said that even under section 3300 the depreciation of the value of the mill could not be allowed since it would constitute double recovery, but we think that section does not govern and that the damages herein must be measured by section 3306 of the Civil Code. That section is a special section relating to detriment caused by breach of agreement to convey an estate in real property and, being special, its provisions prevail over the general statute on damages and recovery in a case governed by that section is limited to those items of damages mentioned therein. The section pur-

ports to state what damages are recoverable in such case and damages not therein mentioned are thereby excluded and cannot be recovered. The only provision of that section which it is claimed covers the item under discussion is that the item constitutes a cost to respondent to enter upon the land. The trial court found that this item was a cost for entry upon the land and also that the building of access roads to and into the land for the purpose of taking out timber from the land to the mill were costs expended in preparation for such entry. But these costs were not expenditures incurred in preparing to enter upon the land. They were expenditures made in accomplishing the general purposes for which the property was bought, that is, expended in the use of the land. The phrase "to enter upon the land" refers to the taking of possession rather than to things done to put the land to general use. This land was timber land. Its highest and best use was for the marketing or manufacturing into lumber of the timber growing thereon. Nothing was expended in preparing to enter upon the land. The expenditures were made for the use of the land and that use continued for some time until, by reason of appellants' breach of the contract, possession was lost. In view of the foregoing we are convinced that, except for the depreciation in value of the mill and of the moneys expended in the building of access roads, the record supports the judgment, but that the judgment should be modified by striking out the award of damages for such depreciation of the mill and for the cost of such access roads.

Appellants argue also that the allowance of the difference in the value of the timber between the date of the contract and the date of its breach was not proper because, appellants contend, there is no evidence in the record as to what the actual damages of respondent were. However, the following statement in the memorandum opinion of the trial court appears to be supported by the record:

"There is little, or no conflict, in the evidence, on the amount of damages suffered by plaintiff. The only item, on which any evidence was offered by defendant, related to the increase in the value of timber, and that is practically in accord with the evidence offered by the plaintiff."

The court found that appellants by their acts and omissions "wilfully placed themselves in a position under which they could not then or ever carry out the terms and conditions of said contract." While there is considerable conflict in the

testimony, we are satisfied that the evidence supports the findings both as to the breach and as to the damages, with the exception of the items allowing damages for the amount of the depreciation in the value of the mill and the cost of the access roads.

Appellants' final contention is that respondent failed to comply with its duty to mitigate damages. Appellants argue that if respondent ''had made its payment on April 29, 1949, as called for by the contract no damage would have occurred at all because as Crag thereafter removed timber to provide its mill with the necessary logs as it had contemplated, sufficient moneys would have become due to keep the payments to North Coast current.''

Respondent in reply states that appellants overlook the fact that Crofoot's contract with North Coast was terminated two months before April 29, 1949.

Whether or not respondent failed in any duty to minimize damages was a question for the trial court to determine upon the conflicting evidence hereinbefore referred to. ██ As stated in *Valencia* v. *Shell Oil Co.*, 23 Cal.2d 840, at page 846 [147 P.2d 558] : ''The duty to minimize damages does not require an injured person to do what is unreasonable or impracticable.''

No other points raised require discussion.

In view of the foregoing we are convinced that, with the exception of the depreciation of the mill and the cost of the roads hereinbefore mentioned, the record supports the judgment, but that the judgment should be modified by striking out the award of damages for said depreciation of the mill and the cost of the roads.

The judgment is modified by subtracting from the total sum thereof, to wit, $118,575.80, together with interest at the legal rate on the sum of $31,250.00 of the above amount from April 30, 1948, to the date of judgment, the sum of the amount allowed for depreciation in the value of the mill and the amount allowed for construction of roads, these two sums totaling $41,512.95, and as so modified the judgment is affirmed.

Van Dyke, P. J., and Peek, J., concurred.

A petition for a rehearing was denied October 26, 1956, and the judgment was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied November 28, 1956.