[Nos. A084401, A086021. First Dist., Div. Four. Jan. 23, 2001.]

THE NIPPON CREDIT BANK, LTD., LOS ANGELES AGENCY,
Plaintiff and Appellant, v.
1333 NORTH CALIFORNIA BOULEVARD et al., Defendants and
Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.A., II.C.1. and II.C.2.

488

COUNSEL

Senn, Palumbo & Meulemans, Kevin J. Senn, Catherine S. Meulemans and Michael J. Kerins for Plaintiff and Appellant.

Miller, Starr & Regalia, Edmund L. Regalia and Lewis J. Soffer for Defendants and Appellants.

OPINION

HANLON, J.*—Defendants 1333 North California Boulevard, a limited partnership (the Partnership), Sunset Ridge, Co., Inc. (Sunset) and Sanford Diller (Diller; the Partnership, Sunset and Diller are referred to collectively as Borrowers) appeal from the order denying their motion for judgment notwithstanding the verdict after a jury found them liable to plaintiff The Nippon Credit Bank, Ltd., Los Angeles Agency (Bank) for bad faith waste. Bank appeals from the order granting a new trial, and Borrowers appeal from a subsequent order involving the order for new trial.

The principal issues are whether a lender can recover for waste when the lender's security is substantially impaired by the borrower's bad faith failure to pay real property taxes, and whether that failure in this case supports an award of punitive damages. We answer both of those questions in the affirmative in the published portion of this opinion.

## I. BACKGROUND

Sunset and Diller were the general and managing partners, respectively, of the Partnership, which developed, owned and operated a two-building office complex in Walnut Creek (the Project). Diller owned Sunset and, through

*Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Sunset and the DNS Trust (DNS), a family trust, he owned over 80 percent of the Partnership. Diller was the "last word" on all important financial decisions for the Partnership.

The Partnership borrowed $73 million from Bank in 1989 to refinance an initial construction loan of approximately $55 million from another lender and complete construction of the Project. Bank's loan officer, Greg Gillam, testified that a "large chunk" of the difference between the amounts of the original construction loan and Bank's loan was earmarked to repay Diller for his investment in the Project. Diller acknowledged that the Partnership received $10 million of the proceeds of Bank's loan. Cal Prom Inc., a construction company wholly owned by Diller, received $5.1 million of the loan proceeds.

Bank's loan was structured as a nonrecourse obligation. The Partnership paid interest on the loan at a variable rate tied to the London Inter-Bank Offer Rate (LIBOR), and could elect to "lock in" specified rates for one- to six-month periods. The Partnership was required under the deed of trust securing the loan to timely pay all property taxes for the Project, and Bank had the right under the loan documents to pay the taxes if the Partnership did not. The Partnership was authorized under the deed of trust to collect and retain rents from the Project until written revocation of that right from Bank after an event of default.

The Partnership made all loan and property tax payments until December 1994, when Diller directed that the $358,000 property tax installment due on the 12th of that month not be paid. Before that decision was made, the Partnership had asked Bank for a concession on the rate of interest payable on the loan, and the request had been denied.

Vicki Mullins, who was the chief financial officer of the Project's property manager, another Diller-owned entity called Maxim Property Management, and another Partnership representative met with Gillam and another Bank representative on November 15, 1994. Mullins presented projections showing that, because of rising interest rates and other factors, the Project would have a cash flow shortfall of over $1 million in 1995. A number of leases were coming due the next year, rental rates were decreasing, and tenants were demanding shorter leases with more tenant improvements. Mullins and Diller testified that there was a severe real estate recession at the time. "[T]he state of the economy was an absolute disaster," Diller said, and "[d]evelopers were dropping like flies." Appraisals submitted by the Partnership to Bank showed that the Project's value had dropped from $103

million in September of 1989 to $52 million in November-December of 1994.

In his memo of the November 1994 meeting, Gillam said he thought that the Partnership could pay more interest than Mullins projected if it paid all tenant improvement costs, and requested that Diller "use his own cash to cover deficits of the [P]roject because he has already earned a large amount of money through the [P]roject." On December 2, Mullins faxed Gillam a letter stating that the Project would have a negative cash flow "prior to any increase in the LIBOR rate" if it paid Bank's loan, the property tax install-ment, the operating expenses, and the tenant improvements due that month. The letter requested a "six-month lock" at the current LIBOR rate. Diller conceded at trial that this request was for a "below market" interest rate—a concession Bank was not legally obligated to make. Gillam called Mullins about five minutes after receiving the fax and rejected the request.

Diller testified that he would have paid the December 1994 tax installment if Bank had "worked with us," but he was "convinced that they were not dealing fairly . . . ." He said that his decision not to pay the taxes was "very difficult" and taken with "a lot" of thought. Diller admitted that the Project had sufficient cash flow that month to make the payment. There was no dispute that the Partnership had the means to pay the taxes. On the date the $358,000 tax payment was due, the Partnership paid Diller's entity DNS over $683,000. Diller said that this payment was made to reduce DNS's investment in the Partnership.

Diller acknowledged at trial that the unpaid taxes would be a charge against the Project, and that Bank would eventually have to pay the taxes or accept a reduced sale price for the Project. He also agreed that the missed $358,000 payment was a substantial sum of money. However, he thought that the amount of the unpaid taxes was insignificant compared to the value of the Project and that the missed payment did not substantially impair Bank's security. He denied using nonpayment of the taxes to try to gain leverage to force Bank to make concessions. However, Diller did say that he wanted Bank to "share the pain."

In addition to directing that the December 1994 taxes not be paid, Diller caused the Partnership to default on the January and February 1995 loan payments to Bank. He explained: "The reason it was decided [not to make the January loan payment] was that it was determined at that time [Bank] in negotiations and restructuring this loan was acting in bad faith, [Bank] was not dealing fairly, [Bank] had no intention of restructuring the loan. [¶] What

[Bank] intended to do was to bleed the [P]artnership dry, to have the [P]artnership come up with outside funds and to convert this loan from a nonrecourse loan to a recourse loan, and then as soon as [Bank] has bled the [P]artnership dry and got all the money it could out of it through outside sources so that the loan would be kept current, then it would go ahead on its previously-determined course of action and take the property away from the [P]artnership. [¶] And that's why we felt it was hopeless to allow this bank to extract all of this money from us and also throw us off the property. [¶] They were not negotiating in good faith, although negotiations did continue to try and save the ship after that . . . ."

The Partnership sent Bank a series of proposals in January and February of 1995. On January 5, Mullins faxed Gillam a proposal to purchase the Project at fair market value. On January 6, Mullins faxed Gillam a letter stating: "Rather than a deed in lieu, we would like to propose a cash flow mortgage." On February 3, Mullins faxed Gillam a term sheet for restructuring Bank's loan. On February 16, Mullins faxed Gillam a letter asking for "your thoughts on an outright sale for cash." On February 28, Mullins faxed Gillam a letter proposing a deed in lieu of foreclosure.

No agreement was ever reached, other than a "pre-workout" agreement which stated that no agreement on preliminary issues would be binding in the absence of a global settlement. Gillam testified that Bank agreed at one point to take a deed in lieu of foreclosure, but that arrangement fell through when the Partnership proposed additional conditions. Gillam said that Bank would sometimes make concessions if the customer kept the loan current and generally lived up to its obligations. Here, Gillam said, "there were so many proposals and the borrower was still unwilling to pay any amount of the past due interest, we didn't know whether he was serious or not." Gillam said he told Diller that he thought Diller was negotiating in bad faith and trying by his tactics to hold Bank "hostage." Gillam said Bank eventually came to believe that "they were not serious about any kind of negotiation, that they were just intent on withholding the rent or not paying the interest and on taking as much cash out of [the] building as they could before eventually they would—they were going to lose it."

On February 14, 1995, Bank sent the Partnership an effective demand to turn over rents from the Project, and the Partnership thereafter complied with the demand. Diller testified that, before receipt of that demand, he regarded the Project's revenue as "our money." Diller acknowledged that his family trust, DNS, received a net amount of $1.7 million from the Partnership from December 5, 1994, to April 1, 1995. He said that he still lost $5.2 million in the Project.

The Partnership remitted approximately $300,000 from Project revenues to Bank in March 1995, and approximately $440,000 in April 1995. Gillam testified that when these funds were delivered the outstanding balance of the loan was about $1 million. Bank used these funds in April 1995 to pay the $394,713.56 then due for the delinquent December 1994 property tax installment.

The jury awarded this $394,713.56 sum to Bank as compensatory damages for bad faith waste, based on findings that Borrowers' failure to pay the December 1994 taxes was not "caused solely or primarily by an economic downturn," and that the failure to make this payment was intended to harm, and did substantially impair, Bank's security interest. The jury found by clear and convincing evidence that the failure to pay the taxes was done with malice, and awarded $8,333,333.33 in punitive damages. Borrowers' motion for judgment notwithstanding the verdict was denied, but their new trial motion was granted unless Bank agreed to remit all but $1.6 million of the punitive damage award. Bank declined the remittitur and a new trial was ordered.

## II. DISCUSSION

### A. *Motion for Summary Disposition of Appeals**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. *Judgment Notwithstanding the Verdict*

#### 1. *Liability for Bad Faith Waste*

 Borrowers contend that they were entitled to judgment notwithstanding the verdict on the ground that their failure to pay the property tax installment cannot be deemed to have been an act of bad faith waste. The "bad faith waste" cause of action was established in *Cornelison v. Kornbluth* (1975) 15 Cal.3d 590 [125 Cal.Rptr. 557, 542 P.2d 981], and extended in *Osuna v. Albertson* (1982) 134 Cal.App.3d 71 [184 Cal.Rptr. 338], to situations where the defendant has failed to pay real property taxes. Borrowers contend that *Osuna* misconstrued *Cornelison* and that *Osuna* was incorrectly decided.

The plaintiff in *Cornelison* sold a residence and took back a note and deed of trust. The home was subsequently conveyed by buyers to the defendant

*See footnote, *ante,* page 486.

and eventually condemned as unfit for human habitation. The plaintiff caused the property to be sold at a trustee's sale, and bought it for a full credit bid. She then sued the defendant for breach of contract and waste. Summary judgment was entered for the defendant on the contract claim on the ground that he had not assumed the secured debt and thus was not liable for breaching covenants in the deed of trust, and on the waste claim on the ground that plaintiff's full credit bid precluded any claim that her security had been impaired. The Supreme Court affirmed, but concluded that the plaintiff might have had a claim for bad faith waste had she not made a full credit bid for the property.

■ The court noted that the common law action for waste was partially codified in Civil Code section 2929, which provides that "[n]o person whose interest is subject to the lien of a mortgage may do any act which will substantially impair the mortgagee's security." (*Cornelison v. Kornbluth, supra*, 15 Cal.3d at p. 597.) The court reasoned that the prohibitions against deficiency judgments on purchase money obligations (Code Civ. Proc., § 580b) or following trustee's sales (*id.*, § 580d) would bar an action for impairment of security where failure to maintain the property was caused by a "general decline of real property values." (*Cornelison*, at pp. 603-605.) However, the court concluded that "bad faith" waste resulting from "reckless," "intentional" or "malicious" conduct would be actionable despite those prohibitions. (*Id.* at pp. 604-605.)

■ The *Osuna* case held that an action for waste could be predicated on the failure of a trustor of a deed of trust or a mortgagor to pay real property taxes, finding that this conclusion was supported by "a fair reading of the holding in [*Cornelison*], in relation to the facts alleged." (*Osuna v. Albertson, supra*, 134 Cal.App.3d at p. 77.) The cause of action for waste in *Cornelison* "alleged in substance that defendant owed a duty to properly and adequately care for the property and that defendant negligently failed to fulfill this duty, thereby causing plaintiff to be damaged in specified particulars and amounts by reason of the loss of improvements to the real property as well as by reason of the loss of its use." (*Cornelison v. Kornbluth, supra*, 15 Cal.3d at p. 594.) While these allegations did not refer to failure to pay property taxes, the waste claim in *Cornelison* also incorporated by reference the material allegations of the breach of contract cause of action, where the breaches included failure to pay property taxes as well as failure to properly maintain the property. (*Ibid.*) It also appeared from the trial court ruling quoted in the opinion that the plaintiff in *Cornelison* alleged that the defendant had duties apart from the contract to pay taxes on the property as well as maintain it. (*Id.* at p. 595, fn. 1.) Thus, while *Cornelison* did not mention failure to pay

property taxes in its analysis of the waste claim, *Cornelison*'s discussion of that claim could plausibly be construed as it was in *Osuna* to encompass that dereliction. Accordingly, we are not persuaded that *Osuna* misconstrued *Cornelison*.

Nor are we persuaded that *Osuna* was wrongly decided. *Osuna* acknowledged that the court in *Krone v. Goff* (1975) 53 Cal.App.3d 191, 194-195 [127 Cal.Rptr. 390], a case decided before *Cornelison*, had found no authority for the proposition that failure to pay real property taxes constituted waste. However, that lack of authority was remedied by the discussion in *Cornelison*. (*Osuna v. Albertson, supra*, 134 Cal.App.3d at p. 77 [noting timing of the decisions]; see also 4 Miller & Starr, Cal. Real Estate (3d ed. 2000) Deeds of Trust, § 10.53, p. 159, fn. 10 [characterizing *Krone*'s references to waste liability for nonpayment of taxes as dicta]; cf. Leipziger, *The Mortgagee's Remedies for Waste* (1976) 64 Cal. L.Rev. 1086, 1109 [describing *Krone* as a "muddled opinion"].) *Osuna* also observed that cases in other jurisdictions were split on whether failure to pay property taxes could constitute waste. (*Osuna v. Albertson, supra*, 134 Cal.App.3d at p. 78.) However, *Osuna* correctly anticipated the direction of the law on this point.

"Relatively few courts have had occasion to consider whether waste includes nonpayment of real estate taxes by the mortgagor," but "[t]his broad conception of waste appears to be part of an emerging legal trend with roots dating to the 19th Century." (*N. American Sec. Life v. Harris Trust & Sav. Bank* (N.D.Ill. 1994) 859 F.Supp. 1163, 1165.) For example, willful failure to pay property taxes has been recognized as actionable waste under New York law on facts much like those presented here, where the partnership borrower owned an office building and distributed $17 million to its partners shortly after defaulting on a tax payment. (*Travelers Ins. Co. v. 633 Third Associates* (2d Cir. 1994) 14 F.3d 114, 117-118.) The Second Circuit's opinion in the *Travelers* case noted that a number of other courts had likewise held that failure to pay property taxes could constitute waste. (*Id.* at p. 123 [collecting cases].) Commentators have recognized the split of authority among the states (Rest.3d Property, Mortgages, § 4.6, reporter's notes, p. 279 [collecting cases]; see also Annot., What Constitutes Waste Justifying Appointment of Receiver of Mortgaged Property (1974) 55 A.L.R.3d 1041, 1046, 1068-1075 [nonpayment of taxes is generally regarded as waste justifying appointment of a receiver]), but have observed that courts are becoming more willing to hold borrowers who fail to pay real property taxes liable for waste notwithstanding nonrecourse provisions of their loans (Stein, *The Scope of the Borrower's Liability in a Nonrecourse Real Estate Loan* (1998) 55 Wash. & Lee L.Rev. 1207, 1210 (hereafter Stein)).

The commentaries persuasively endorse this liability. The Restatement Third of Property, Mortgages, section 4.6, subdivision (a), page 262, lists as a form of waste, along with physical alteration or neglect of mortgaged property, a mortgagor's failure to pay property taxes secured by a lien with priority over the mortgage. (See also *id.*, § 4.6, subd. (b)(3), p. 262 [damages may be recovered to the extent of the security's impairment].) Waste encompasses default on senior tax liens because the mortgagee "has a reasonable and legitimate expectation that the mortgagor will not place a governmental entity in a position to destroy the mortgage." (*Id.*, § 4.6, com. b, p. 265.) "While there may be disagreement as to the scope of the borrower's obligation to maintain the property physically, particularly if the documents are imprecise, there can be little question that the borrower, as owner, is expected to pay all real estate taxes." (Stein, *supra*, 55 Wash. & Lee L.Rev. at p. 1275.) As Diller conceded at trial, amounts secured by a tax lien will either have to be paid by the lender (Rest.3d Property, Mortgages, § 2.2, com. a, pp. 70-71 [authorizing advances for this purpose]) or they will reduce the price paid for the property at foreclosure (Stein, at p. 1269, fn. 169). Unpaid real property taxes thus reduce the chances of full recovery of the debt (*id.* at p. 1270, fn. 171), and "from the secured creditor's vantage point . . . may be as costly as a leaky roof" (*Travelers Ins. Co. v. 633 Third Associates, supra,* 14 F.3d at p. 121).

The Stein article discusses at length why borrowers should be subject to personal liability for failing to pay property taxes and other forms of waste even if their loans are nonrecourse. On the one hand, "the tax payment is just another check that the borrower must write, resembling the obligation to pay principal and interest for which the nonrecourse borrower is not personally liable." (Stein, *supra*, 55 Wash. & Lee L.Rev. at p. 1277, fn. 196.) Moreover, the lender's failure to require that the borrower expressly assume personal responsibility for the obligation to pay taxes could be interpreted to mean that no such liability was intended. (*Id.* at p. 1277.) On the other hand, nonpayment of taxes may be just as damaging to the security as intentional destruction of the property, an act which the lender could not have intended to permit. (See *id.* at pp. 1275, fn. 192 & 1277, fn. 196.) Moreover, "nonrecourse borrowers have a special responsibility to protect an asset of theirs that they have pledged to another as the sole security for repayment of a debt." (*Id.* at p. 1245.) Thus, there are circumstances where a nonrecourse borrower should be liable for waste, including failure to pay real property taxes. (*Id.* at p. 1272.)

Such liability redresses the kind of harm the tort of waste was originally designed to remedy. (See *Travelers Ins. Co. v. 633 Third Associates, supra,*

14 F.3d at p. 120, fn. 7.) The waste doctrine was developed to mediate between the competing interests of life tenants and remaindermen. (Stein, *supra*, 55 Wash. & Lee L.Rev. at p. 1241, fn. 87, quoting Posner, Economic Analysis of Law (5th ed. 1998) p. 83.) If the income-producing property were a forest, the life tenant would want to cut down the trees before their maturity even if the present value of the timber would be greater if the logging were postponed beyond the tenant's expected lifetime. (Stein, at p. 1241, fn. 87.) Similarly, the owner of a distressed property will be tempted to "scavenge whatever it can for its own benefit" and "squeeze as much money out as possible" before the property is lost, with no regard to the property's resulting condition. (*Id.* at pp. 1243 & 1247, fn. 103; see also p. 1243, fn. 92 [likening this situation to the return of a rental car with an empty gas tank].) The prospect of tort liability may deter the borrower from thus behaving "like a life tenant with very little time left to live." (*Id.* at p. 1241, fn. 87.)

Such "milking" of the security has been recognized as a form of bad faith waste within the meaning of *Cornelison* (see *In re Mills* (9th Cir. 1988) 841 F.2d 902, 905), and a trier of fact could find that the missed tax payment qualified as "milking" in this instance. There may be exigent circumstances which would justify a failure to pay real property taxes; for example, where a choice must be made between paying the taxes and making loan payments or necessary repairs, a tax default might merely rearrange the lender's loss without increasing it. (Stein, *supra*, 55 Wash. & Lee L.Rev. at pp. 1273-1274.) In this case, however, the Project had not reached such dire straits when Diller directed that the taxes not be paid. The evidence shows that Diller caused the Partnership to pay DNS, his own trust, nearly twice the amount of the $358,000 tax installment on the day the taxes were due, and that DNS received a total of $1.7 million from the Partnership while the taxes remained delinquent. It is clear that the Partnership had accumulated sufficient earnings to make the tax payment and meet its other immediate obligations when it was decided that the taxes would not be paid. Thus, the situation here cannot be distinguished from the one in *Travelers*, where the partnership borrower was found subject to waste liability for neglecting to make a tax payment and then distributing millions of dollars to its partners.

This case is distinguishable, however, from *In re Mills, supra*, 841 F.2d 902, where a borrower was found not to have "milked" the security. The borrower in *Mills* had operated the property for only a few months and "lost the bulk of his investment." (*Id.* at p. 905.) Here, Bank officer Gillam's belief that Diller had reaped profits from the Project was supported by evidence that the Partnership received $10 million of Bank's loan as a

repayment of Diller's investment in the Project, that various Diller entities were paid for construction and management of the Project, and that the Project was operated successfully for a number of years. Thus, there were reasons to doubt Diller's claim that he had lost money on the Project. Viewed in the light most favorable to the verdict, the record does not establish a loss of the bulk of Borrowers' investment.

The ultimate test proposed in the Stein article for waste liability in connection with a nonrecourse loan is whether the lender has "suffered losses caused by actions the borrower would not have taken had it been fully liable." (Stein, *supra*, 55 Wash. & Lee L.Rev. at p. 1244.) Assuming that this test correctly reflects the "bad faith" standard for liability under *Cornelison*, it was satisfied here. Borrowers cannot plausibly claim that the Partnership would not have paid the property taxes even if Diller and his partners had been personally liable on Bank's loan. Taxes on the Project were paid for years when it appeared that the Partnership had something of value to lose; only when the Project was threatened was DNS paid in lieu of the tax authorities. (Stein, *supra*, 55 Wash. & Lee L.Rev. at p. 1258, fn. 136 [noting that the nonrecourse borrower is likely to perform like one who is personally liable as long as the project is successful].) Diller's decision not to pay the taxes was apparently made "only because [he] believed that [he] would not have to pay for [its] consequences." (*Id.* at p. 1283.)

Borrowers argue that bad faith waste liability under *Osuna* for failing to pay real property taxes improperly "converts" conduct which is only a breach of contract into a tort. (See *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 [28 Cal.Rptr.2d 475, 869 P.2d 454].) That result, Borrowers submit, is confined to insurance bad faith cases. Borrowers cite authorities indicating that there is no personal liability for real property taxes and that sale of the land is the state's sole remedy for nonpayment of those taxes. (E.g., *McPike v. Heaton* (1900) 131 Cal. 109, 111 [63 P. 179]; *Garcia v. County of Santa Clara* (1978) 87 Cal.App.3d 319, 323-324 [151 Cal.Rptr. 80].) Borrowers reason that in the absence of personal liability to the state for the taxes, or a statute which in so many words makes nonpayment of the taxes a tort, the only possible source of liability for this neglect must be a contract (in this case the deed of trust).

This line of argument is unconvincing. Tax policy and tort law are separate fields. That the state has chosen not to impose personal liability on property owners for real property taxes says nothing about owners' liability to other persons for the tort of waste. The tort codified in Civil Code section 2929 (*Cornelison v. Kornbluth, supra*, 15 Cal.3d at p. 597) has long protected

lenders from "*any act* which will substantially impair" their real property security. That prohibition can properly be extended to nonpayment of real property taxes regardless of whether the omission also creates tax or contract liability. (See *Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 921 [114 Cal.Rptr. 622, 523 P.2d 662] [tort damages may be awarded for conduct which "incidentally involves a breach of contract"].)

Borrowers contend that *Osuna* is distinguishable because the nonpayment of taxes in that case resulted in tax sales of the properties securing the debt. However, total loss of the lender's security is not required; mere impairment of the security constitutes waste if the impairment is "substantial." (Civ. Code, § 2929.)

Borrowers argue that the impairment of security in this case was insubstantial as a matter of law. On the one hand, as Diller admitted, the unpaid $358,000 tax installment was a "substantial" sum of money. On the other hand, as Diller also noted at trial, the unpaid taxes were a small fraction of the value of Bank's security. In these circumstances, where reasonable minds might differ as to the substantiality of the impairment, the question was properly left to the trier of fact.

Borrowers contend finally that, because Bank added the amount it advanced to pay the real property taxes to the indebtedness secured by the deed of trust and conducted a trustee's sale of the property to satisfy that debt, liability for waste is precluded in this case by the one form of action (Code Civ. Proc., § 726) and antideficiency (*id.*, § 580d) rules. Borrowers submit that Bank effectively elected its remedy by pursuing its contract rights to recover the tax advance, and thus could not pursue its tort claim for nonpayment of the taxes.

This argument was raised for the first time in Borrowers' motion for judgment notwithstanding the verdict; no evidence concerning the foreclosure was presented at trial. In connection with the posttrial motion, Borrowers requested judicial notice of: allegations in Bank's April 1995 verified complaint for judicial foreclosure listing the $394,713.56 tax advance as part of the $2,543,797.37 amount then delinquent on the loan; Bank's April 1995 notice of default under the deed of trust listing $2,543,328.37 as the amount to reinstate as of April 20, 1995; and Bank's January 1996 notice of sale under the deed of trust. Borrowers renew their request for judicial notice on appeal, and also refer to Bank's accounting in its complaint herein of amounts due under the loan after the foreclosure, which listed the tax advance as part of the unpaid balance of $28,551,390.59 remaining after

application of the $52,000,000 credit bid entered by Bank's subsidiary to purchase the Project at the trustee's sale.

■ A legal argument may be raised for the first time in a new trial motion or on appeal only "so long as the new theory presents a question of law to be applied to undisputed facts in the record." (*Hoffman-Haag v. Transamerica Ins. Co.* (1991) 1 Cal.App.4th 10, 15 [1 Cal.Rptr.2d 805]; see *id.* at p. 16.) ■ Since evidence for the election of remedies argument was not brought forth until the motion for new trial, the argument can be rejected here, as it was in the trial court, as unsupported by the record.

This belated argument is contrary to the *Cornelison* case in any event. *Cornelison* provides for a tort action for bad faith waste following a nonjudicial foreclosure unless the foreclosure results, by full credit bid or otherwise, in full satisfaction of the secured debt. Where as here the creditor "bids less than the full amount of the obligation and thereby acquires the property valued at less than the full amount, his security has been impaired and he may recover damages for waste in an amount not exceeding the difference between the amount of his bid and the full amount of the outstanding indebtedness immediately prior to the foreclosure sale." (*Cornelison v. Kornbluth, supra,* 15 Cal.3d at p. 607.) Nothing in this passage suggests that the "full amount" of the outstanding debt cannot include money the creditor has advanced for the unpaid taxes. If the foreclosure results in payment of all or a portion of that advance, *Cornelison*'s cap on compensatory damages will preclude any double recovery in a subsequent waste action. There was no double recovery in this instance; the figures Borrowers cite show that Bank was still owed millions of dollars after application of the credit bid at the foreclosure. Bank could therefore "recover any provable damages for waste." (*Id.* at p. 608.)

## 2. *Jury Instructions*

■ Borrowers contend that the court erred in its instructions on the issue of substantial impairment of Bank's security by defining "substantial" as "more than a slight, trivial, negligible, or theoretical factor." The court borrowed this language from the comment to the standard instruction on the substantial factor test in negligence law. (See com. to BAJI No. 3.76 (8th ed. 1994) p. 99.) Borrowers submit that the court should instead have defined "substantial" as "[o]f real worth and importance; of considerable value; . . . [s]omething worthwhile as distinguished from something without value or merely nominal." (Black's Law Dict. (Abridged 5th ed. 1983) p. 744, col. 2.)

As Bank observes, a requirement that the security impairment be "considerable" may put a lender in an untenable position where the impairment

stems from a failure to pay real property taxes. Given the duty to mitigate damages (*Valle De Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691 [32 Cal.Rptr.2d 329]), the lender should not be made to wait for the tax lien to mushroom with multiple unpaid installments, and should not be penalized for promptly curing a tax default. We therefore conclude that in this case the court's instruction was better than the one Borrowers proposed.

We note further that even if Borrowers' definition would have been preferable, there is no reasonable probability that its use would have produced a different verdict. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal.Rptr.2d 607, 882 P.2d 298].) The court's instruction was consistent with the not "merely nominal" language of Borrowers' definition, and the large punitive damage award shows that the jury regarded Borrowers' malfeasance as very "real" and "considerable."

### 3. *Liability for Punitive Damages*

Borrowers assert that there is no precedent for an award of punitive damages for waste, and contend that there was no substantial evidence to support the jury's finding that the waste in this instance was malicious. However, entitlement to punitive damages is generally an issue for the trier of fact (Civ. Code, § 3294, subd. (a); *Beckett v. City of Paris Dry Goods Co.* (1939) 14 Cal.2d 633, 639 [96 P.2d 122]; *Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1658 [57 Cal.Rptr.2d 525]), and this case is no exception.

Borrowers argue that they cannot be held liable for punitive damages because, in failing to pay the taxes, they did no more than exercise their contractual right to retain the rents and profits from the Project. As has been indicated, Bank did not effectively revoke that right until two months after the taxes were due. However, as has also been explained, Borrowers had a legal duty under tort law, as well as a contractual obligation, to pay the taxes. They indisputably breached that legal duty and contractual obligation when Diller decided that the taxes would not be paid. Borrowers' right to retain funds from the Project rather than turning that money over to Bank did not give them a license to commit waste.

Borrowers argue that "[t]o look back at [their] decision not to pay the December 1994 installment of property taxes, and say that it was malicious, and intended to harm [Bank] rather than to further the interests of [Borrowers], is not a permissible inference from the evidence." There are multiple problems with this argument. First, it is not apparent why the aim of Borrowers' conduct had to be *either* furthering their own interest *or* harming

Bank. Those aims are not mutually exclusive. Second, no authority supports the suggestion that a party can escape liability for malicious conduct merely because it hopes to benefit from its actions. Third, Diller admitted that the taxes would have been paid if Bank had granted the interest rate concession the Partnership sought. The jury could infer from this testimony that Borrowers withheld the tax payment to "punish" Bank for failing to accede to their demand, and that inference was sufficient to support the finding of malice. (Civ. Code, § 3294, subd. (c)(1) [malice includes conduct which is intended to injure the defendant].)[1]

Borrowers maintain that "the mere breach of a contractual obligation, even if committed in order to gain an advantage in negotiations with the other party to the contract," cannot support a finding of malice. They derive this proposition from *Beck v. State Farm Mut. Auto. Ins. Co.* (1976) 54 Cal.App.3d 347 [126 Cal.Rptr. 602]. This contention also fails for multiple reasons. First, to reiterate, Borrowers did not merely breach a contractual obligation; they committed a tort. Second, the *Beck* case is inapposite. The court in *Beck* found that the defendant's bad faith failure to settle an insurance claim did not support a finding of malice. (*Id.* at p. 356.) The court did not purport to apply any rule like the one Borrowers' postulate, and instead grounded its conclusion on the particular circumstances presented (*ibid.*), which were not analogous to those here. The evidence in *Beck* showed, among other things, that the defendant had a reasonable doubt as to the extent of its liability when it asserted a defense it knew to be invalid. Here, as Bank notes, Borrowers could not claim any doubt about their obligation to pay the real property taxes, or the amount of that obligation, when they decided not to pay it.

Third, the evidence does not necessarily justify Borrowers' assertion that they intended to try to reach some agreement with Bank after they defaulted on the tax payment. While conflicting inferences could be drawn from the evidence, the jury could have determined that Borrowers' sole aim in defaulting on the taxes and thereafter was to extract as much money from the Project as possible before walking away from it. The jury could have accepted Bank's argument that the Partnership's flurry of proposals after the tax default was meant only to delay Bank's demand for the Project's revenues. We observe that Diller had already determined by the time he decided not to pay the taxes that Bank had no intention of making any fair

---

[1]Malice also includes despicable conduct taken with a willful and conscious disregard of the rights of others (Civ. Code, § 3294, subd. (c)(1)), and Bank cites authority on this "conscious disregard" form of malice. However, since the jury here was not instructed on this form of malice, it will not be considered.

accommodation—that was his professed reason for withholding the tax payment.

Exposure to punitive damages may be as much a deterrent to bad faith waste as to any other tort. (See Stein, *supra*, 55 Wash. & Lee L.Rev. at p. 1245, fn. 97.) It was up to a jury to decide whether those damages were justified in this case.

C. *Motion for New Trial\**

1., 2.\*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### III. DISPOSITION

The order denying the motion for judgment notwithstanding the verdict, and the order for a new trial on the amount of punitive damages only, are affirmed. The parties shall bear their own costs on appeal.

Reardon, Acting P. J., and Sepulveda, J., concurred.

The petition of defendants and appellants for review by the Supreme Court was denied May 16, 2001.

---

\*See footnote, *ante*, page 486.