Filed 8/26/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SCHELLINGER BROTHERS et al.,<br><br>     Plaintiffs and Respondents,<br><br>v.<br><br>JAMES F. COTTER,<br><br>     Defendant and Appellant. | A142201<br><br>(Sonoma County<br>Super. Ct. No. SCV-253161) |

This is the third appeal involving a frustrated attempt by respondent Schellinger Brothers[1] to develop a large tract of real property in the City of Sebastopol (the City) it had agreed to purchase from appellant James F. Cotter. We opened our opinion in the second appeal with the following:

"In *Schellinger Brothers v. City of Sebastopol* (2009) 179 Cal.App.4th 1245 (*Schellinger I*), this court first encountered the controversy surrounding a proposed commercial development that had become ensnared in a bureaucratic and politically charged morass that saw the certification of an environmental impact report (EIR) stymied for five years. The frustrated developer sued the municipality for a writ of administrative mandate to halt the seemingly endless proceedings under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq. (CEQA)). We held that none of the developer's statutory arguments could 'be used to halt the decisionmaking process specified by CEQA that is still ongoing.' (*Schellinger I, supra,*

---

[1] Schellinger Brothers is a partnership of actual brothers William and Frank. Individually, and as the partnership, they are the plaintiffs herein. For simplicity, they will hereafter collectively be designated as Schellinger except when there is a reference to a specific individual.

at p. 1250.)  We specifically rejected Schellinger's central contention that one provision of CEQA—Public Resources Code section 21151.1—imposed a 'mandatory, nonwaivable jurisdictional deadline' of one year for approval of an EIR.  (*Id.* at pp. 1259–1261.)

"In the course of developing the developer's statutory claims, we stated that 'the developer's active participation in that process . . . amounts to laches,' an additional ground for denying relief.  (*Schellinger I, supra,* at p. 1250.)  We explained that 'a significant portion of the extended delay was solely attributable to Schellinger, which was repeatedly revising the scope of its proposal,' thereby adding 'a dimension of complications that distinguished this proposed project from the run-of-the-mill development.'  (*Id.* at pp. 1268, 1270–1271.)

"Those statements were the basis for this collateral, follow-up litigation between James F. Cotter, the owner of the land, and Schellinger Brothers, the proposed developer of the project.  Cotter sued Schellinger for breach of the contract to purchase the property.  Cotter's position was that *Schellinger I* established as a matter of law that Schellinger breached the contract by taking an unreasonably long period of time to secure approval of the project.  The trial court disagreed with this reading of *Schellinger I,* and after a bench trial, concluded that Schellinger's actions were reasonable.  As part of its judgment, the court fixed a date by which Schellinger must secure final approval of the project by the municipality."  (*Cotter v. Brothers* (Aug. 5, 2013, A135014) [nonpub. opn.] (*Schellinger II.*)

We affirmed that judgment, noting that "the history of this dispute would bring tears to the eyes of a brass monkey."  (*Schellinger II*, at pp. 1–2.)  We spoke too soon, for a third round of litigation commenced by Schellinger was already under way.  Following a bench trial of Schellinger's complaint against Cotter for breaching the contract between them, the Honorable Elliot Lee Daum entered a money judgment for $2,855,431.77 in favor of Schellinger, and then an order awarding costs and attorney fees.

Cotter appeals from the judgment and from the order.  He contends:  (1) Judge Daum misinterpreted the contract; (2) Judge Daum's finding that Cotter breached the

contract is both legally erroneous and not supported by substantial evidence; and (3) Judge Daum erred in concluding that Schellinger was entitled to consequential damages that were the proximate result of Cotter's breach. Assuming that he will prevail with these arguments, Cotter argues that the cost and fee order must also be reversed. We are in full agreement with Judge Daum's ultimate conclusions: (1) Cotter committed an egregious breach of his contract with Schellinger, a breach animated by egregious bad faith; and (2) Schellinger suffered damages proximately caused by Cotter's breach in the amount fixed by the trial court. And although the amount of damages appears to be of unprecedented size, the distinct circumstances of the transaction put them within "the expenses properly incurred in preparing to enter upon the land" and consequential damages, both made recoverable by Civil Code section 3306. We thus affirm.

## BACKGROUND

This cause was the subject of a five-day bench trial with 11 people who testified in person, one who testified via deposition, and dozens of exhibits. The statement of decision prepared by Judge Daum figures prominently in this appeal. With minor, nonsubstantive editorial changes we have made to the text, and footnotes we have added for context, the statement deserves quotation almost in its entirety:

"This case involved the contract for sale of commercial property in Sebastopol, California, an approximately 21 acre tract known as Laguna Vista. Seller is defendant James Cotter. The buyers are known as The Schellinger Brothers, plaintiffs in this case. Mr. Cotter is 80 years old, a self-described, self-made man who came to Sonoma County in 1964 and started a commercial real estate business that spread to many other parts of the country. [Plaintiffs] have confined most of their construction and development to Northern California where they have been in business for about 35 years.

"After plaintiff's opening (defendant deferred) Scott Kincaid was called to testify, *inter alia*, that as [Schellinger's] senior loan officer at Community Bank, he had prepared the necessary documents so plaintiffs would have the funds to purchase the subject property. He described the lengthy history of lending to [Schellinger] for numerous projects. It appears to the court that [Schellinger's] credit history with the bank is

3

impeccable and longstanding.  While 'tender' has been made something of an issue, this Court has no doubt that [Schellinger was] ready, willing, and, most significantly, able to consummate this deal with more than adequate funding.  According to witness Kincaid, the bank was willing to collateralize the loan with other holding[s] of [Schellinger], eschewing the need for security in the form of the subject property itself, a nearly 21 acre piece of land with apparently increasing value.  Plaintiff Bill Schellinger's testimony that a $3 million dollar loan 'is not a big deal to us' is a very credible claim and the court accepts that characterization.  Tender was simply not a problem for [Schellinger].

"After a protracted trial before Judge [Rene] Chouteau in 2011, the plaintiffs were given 2 years to obtain the necessary subdivision Map that would make the project worth while and viable.  The Court takes plaintiff Bill Schellinger's comment that 'everybody knew we weren't going to get the Map' at his word.

"At issue, therefore, was [Schellinger's] determination to go forward without the Map, the force and effect of which would be a waiver.

"The negotiations for the sale commenced in August of 1997.  After numerous delays and efforts to smooth out the many wrinkles of permits through the City of Sebastopol and other jurisdictional agencies, [Cotter] made efforts to sell the property to a different buyer, Tux Tuxhorn in 2005.[2]

---

[2] According to Bill Schellinger, "Mr. Tuxhorn called me up and told me that Mr. Cotter was trying to sell him our property . . . .  [¶] . . . [¶]  He wanted to know what the status was, if we were still going ahead or what we were doing with it."  Already, Schellinger's frustration had reached the point it was willing to drop the project if Cotter "wanted to sell it to somebody else, he could buy us out.  And he [Cotter] said, no, that wasn't his intention and for us to carry on."  Judge Daum clearly did not credit Cotter's testimony that "I had nothing whatsoever to do with this Tuxhorn thing.  I never heard of him."

But the topic of a new strategy clearly was on Cotter's mind.  There was evidence in the form of an appraisal commissioned by Cotter that since the agreement was signed in 1998, the value of the undeveloped property had more than doubled to $6 million, and would quadruple to $12 million if it was developed.  About this time, in July of 2005, Cotter wrote Schellinger a letter in which he stated "I . . . consider the contract terminated due to the long time that has passed," but he was "willing to enter into a new contract for

4

"Among the key requirements for execution of the contract and consummation of the sale was 1) the necessity of obtaining a subdivision Map approval through the City; and 2) the completion of Lot Line Adjustments that definitively circumscribe the metes and bounds of the various parcels that were to make up the 21 acre total. In 1999 the Lot Line Adjustment was apparently completed, but [Cotter] apparently refused to sign it and the application expired.

"These key requirements were negotiated as part of the contract in the following provisions:

"[Schellinger's] obligation to close escrow was expressly conditioned on the occurrence of, among other things, two events—the approval by the City and recordation of a final subdivision map. The Agreement[3] provides:

" 'Section C: The intent of this Agreement is that upon the successful completion of an approved final map recordation, seller [Cotter] shall retain the front commercial parcels . . . . [I]t is mutually understood that the exact size of the parcels can not be determined until the project is mapped, surveyed, and has certified approval . . . .

" 'Section 6: Purchaser's obligation to perform under this Agreement is subject to the following conditions: (a) Purchaser's obtaining all approvals for a final subdivision map from City of Sebastopol, California for a Master Planned Development. Purchaser shall promptly apply for and diligently attempt to obtain approvals from Sebastopol, California . . . .

" 'Section 4: Escrow shall close within 30 days after recordation of final subdivision map from the City of Sebastopol. . . .

---

$4,500,000 on the same basis as the old contract as amended with a specified closing date that is not dependent on any approvals for development. The closing date will have to be no later than September 30, 2005. [¶] If that proposal is not agreeable with you, I will proceed with other plans for the property."

[3] Judge Daum was quoting from the parties' May 1998 purchase and sale agreement.

5

" 'Section 10: Closing Date. The conveyance of the Property to Purchaser and the closing of this transaction ('Close of Escrow') shall take place within 30 days following the satisfaction of the conditions set forth in Section 6 and 7.

" 'Section 15: (a) Seller's Covenants. Commencing with the full execution of this Agreement by both parties and until the Close of Escrow: (a) Seller shall not permit any liens, encumbrances, or easements to be placed on the Property, other than the Approved Exceptions, nor shall Seller enter into any agreement regarding the sale, rental, management, repair, improvement, or any other matter affecting the Property that would be binding on purchaser or the property after the Close of Escrow without the prior written consent of Purchaser.

" '(b) Seller shall not permit any act of waste or act that would tend to diminish the value of the property for any reason. . . . [4]

" 'Section 28: This agreement shall inure to the benefit of and shall be binding upon the parties to this agreement and their respective heirs, successor[s], and assigns.'

"In addenda executed by the parties [Schellinger] agreed to obtain a lot line adjustment to sever that portion of the properties which were subject to the agreement from the remainder of Cotter's properties. Because Cotter had not kept property taxes current because the City required that the taxes be paid for the Lot Line Adjustment, [Schellinger] agreed to pay the property taxes for 1998 through June 2001, which totaled $25,400.00. Even after the obligation ended, [Schellinger] voluntarily continued to pay Cotter's taxes because Cotter was not paying them and [Schellinger] was concerned that outstanding taxes would negatively impact [its] map application. [Schellinger] finally stopped paying the taxes after Cotter sued them in a case heard by Judge Rene Chouteau in 2011 [i.e., *Schellinger II*].

---

[4] The provision reads in full: "Seller shall not permit any act of waste or act that would tend to diminish the value of the Property for any reason, except that caused by ordinary wear and tear." (And see fn. 12, *post*.)

6

"The lot line adjustment was ready to be finalized in 2002. It was never completed when [Cotter] submitted escrow instructions not to record the lot line adjustment until [Schellinger's] subdivision Map was recorded.

"Despite prodigious efforts on the part of [Schellinger] to comply with the EIR process in order to obtain the Map[5] and other necessary permits, [Schellinger was] continually frustrated in their efforts by a combination of City denials and non-action.

"No doubt [Cotter] was frustrated, too, and he filed suit against [Schellinger] for breach of contract and to, in essence, terminate the contract. Nonetheless Judge Chouteau ruled, *inter alia*, as follows:

" 'My interpretation is that in the context of this lawsuit and the question of what was reasonable, and that the Schellingers' actions were reasonable in trying to accommodate the community and the City in reducing the density of the development to meet the needs of the community. The Court of Appeal decision [in *Schellinger I*] although binding in this court has to be read in the context of the facts and the claims before the court, and the issue in that case was whether the city had violated the statute which requires approval to be within a year. In that context, the Court of Appeal determined . . . that [it would be] unreasonable [to expect] the Schellingers to come into court to sue the city as to the one-year limitation [when they] themselves had participated in the process that extended beyond the year. I do not interpret that to mean that their efforts to meet [the] needs [of] the community by revising the project in the abstract to be unreasonable in any sense. I think the analysis of the mediation is similar. The Schellingers, in order to try to deal with the issues raised by the community, carried on a period of mediation that lasted approximately a year. As a matter of fact, it appeared to

---

[5] Not only did the City never certify the EIR, the city council never even held a scheduled vote on certifying it. (See *Schellinger I*, 179 Cal.App.4th 1245, 1252–1253.) Schellinger's application for approval of the project, which included a tentative subdivision map application, was deemed complete by the City in 2003. (*Schellinger I*, at p. 1251.)

be successful and resulted in an agreement in the mediation only to be rejected by the City Council.'[6]

"Cotter received no damages or other relief in the lawsuit, save and except, perhaps, Judge Chouteau's setting of a two year timeline for obtaining of the subdivision Map, culminating in June of 2013. It was apparent to [Schellinger] that the 2 year limitation would be insufficient, and they began to consider their option of simply waiving that requirement. The Court finds specifically that it was theirs to waive under traditional contract law and the terms of the original agreement, since the obtaining of the Map would inure solely to their benefit and going through without it put only the Schellingers, not Cotter, at risk. In the case of *Johnson v. Lehtonen* (1957) 151 Cal.App.2d 579, [582,] the Court [of Appeal] observed: . . . 'This provision is obviously for the benefit of the buyer and might have been waived by him.' [Citation.] It was, nevertheless, still Cotter's obligation to obtain the necessary Lot Line Adjustment in order to circumscribe the property bounds as described above. He at least began the process subsequent to his suit against the Schellingers, but it was never completed.[7]

"**The Excavation Problem**

"In the Winter of 2012[8] significant rains occasioned the hiring of one David Ruffino, a landscape contractor from Chico, by . . . Cotter (who had hired Mr. Ruffino for work in the Chico area on prior occasions) to ameliorate flooding and drainage problems

---

[6] In *Schellinger I* we described a mediation that took almost a year to produce an agreement that was then rejected by the Sebastopol City Council. As two members of the council had participated in the mediation, Schellinger probably assumed council approval was a mere formality. When the agreement was then rejected, "[f]or Schellinger, this was the final straw. . . . Schellinger's next move was to commence this litigation." (*Schellinger I*, 179 Cal.App.4th 1245, 1253.)

[7] Judge Daum had before him Judge Chouteau's judgment, which included this finding: "The failure to record a lot line adjustment . . . was caused by Mr. Cotter." Cotter's pending motion to take judicial notice of other materials from *Schellinger II* is denied because Judge Daum was never asked to notice these documents at trial. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2.)

[8] It was actually January 2012, the month following entry of Judge Chouteau's judgment against Cotter in *Schellinger II*.

8

at the property. Ruffino worked without benefit of permit, but his work was halted by personnel from the City of Sebastopol when they discovered Ruffino's permitless status. Though Ruffino did not testify at the trial, his deposition was used to supplement the evidence in varying particulars by both sides. Sadly the lack of permit was only the tip of the iceberg of difficulties created by his failed efforts.

"City Engineer Susan Kelly testified about the unauthorized ditch created by Mr. Ruffino as did Stephen Bargsden from the [North Coast Region] Water Quality Control Board [(Regional Board)] and Dr. Michael Josselyn, a Ph.D biologist from his firm Wetland Research Associates. The entire project has been put into doubt by Mr. Ruffino's efforts because not only were they unpermitted, they jeopardized sensitive wetlands areas. The exact consequences of these actions are not completely known, but they include a 5 year monitoring period and the requirement of significant time and expense for restoration of the habitat ostensibly destroyed by Mr. Ruffino. There is no question but that Mr. Ruffino was the agent for [Cotter] and that [Cotter] is legally responsible for his actions. (*Clark Equipment Co. v. Wheat* (1979) 92 Cal.App.3d 503.) In one of the more disturbing aspects of his deposition testimony, Mr. Ruffino stated: 'Q. Mr. Cotter asked you to lie about what you knew about the trench? Correct? A. Yes. Q. He told you that you need to testify that you knew nothing about the trench; correct? A. Yes. Q. And you refused to do that; correct? A. Well, I don't lie. And, you know, so that's it.' Page 88, lines 1–9 [of Ruffino's deposition].

"Not only does this testimony raise questions about the potential waste involved in [Cotter's] actions, but [Cotter's] overall credibility is called into serious question thereby.

"The final witness who testified for [Schellinger] in this case is Lawrence McLaughlin, City Attorney and City Manager of Sebastopol. Mr. McLaughlin testified that while the Lotline Adjustment and Subdivision Map applications were pending, . . . Cotter attempted to meet with him to discuss his offer to merely donate the property to the City, in complete derogation of any rights of [Schellinger] and utterly

9

without regard to the contract for sale of the subject property.[9]  Mr. McLaughlin was appropriately concerned that any such talks would smack of bad faith and perhaps interference with contract as a tort.  [Schellinger] had spent 15 years and nearly three million dollars by the time of [Cotter's] last effort to simply give the property to the City for a park in October of 2013.  This seemingly magnanimous gesture would have pulled the rug out from [Schellinger's] earnest attempts to consummate the project and fulfill the original terms of the contract.  This scheme by [Cotter] was not magnanimous, indeed it bordered on the unconscionable.

"It is the conclusion of this Court that [Cotter] has breached the contract and is liable for the consequential damages suffered by [Schellinger] due to that breach.

"**Remedy**

"*Things without all remedy should be held without regard.  What's done is done*.

"Lady Macbeth

"Of course the Macbeths were unable to get out the 'Damn spot' and wash their hands of blood, but where does the breach in this case leave the parties?  While a longstanding remedy for failure to appropriately complete a property sale by a seller is specific performance, there are critical reasons why that won't work in this case.  As [Cotter] took pains to point out during the trial, without the completion of the Lot Line Adjustments, there is no realistic way to parse out precisely what the property lines would be.  There was testimony that two of the parcels could be definitively described, but those comprise but 1 and 1/3 acres of the 21 acre whole.  This Court is loath to delve into the realm of surveying in an effort to formulate some equitable remedy.

"Even more significant than [Cotter's] recalcitrance is the trench problem.  The uncertainty created by [Cotter's] agent Ruffino makes the remedy of specific

_____

[9] Cotter made this offer while Schellinger and the City were engaged in the year-long mediation.  The offer was conveyed to one of the city council members who was participating in the mediation.  (See fn. 6, *ante*.)  Cotter repeated the offer directly to City Manager McLaughlin in October 2013.

10

performance illusory and ultimately no remedy at all. Through no fault of [Schellinger], the property was rendered all but useless and will be for years and many dollars to come.

"*Damages*

"Plaintiff Bill Schellinger and his son Scott have testified credibly that they expended $2,855,431.77 in pursuit of this project. They have been through a number of lawsuits, a year's worth of failed mediation, and the project is actually farther away [from completion] than it was in 1999. It seems that it is time to walk away, but not without recompense. Accordingly, this Court awards [Schellinger] their damages in the sum of $2,855,431.77 plus costs according to proof." (Bold type omitted.)

After a judgment for this amount was entered, Judge Daum denied Cotter's dual motion for new trial and vacation of the judgment, made on the grounds of excessive damages and insufficient evidence to support the judgment.[10] Thereafter the parties stipulated to entry of an order fixing Schellinger's costs and attorney fees at $74,360.

## DISCUSSION

Cotter mounts a comprehensive attack on the judgment. He begins by contending Judge Daum misinterpreted the agreement with Schellinger. This misinterpretation led Judge Daum to create a nonexistent duty, which Cotter was found to have breached.

---

[10] What Judge Daum said at the hearing where he orally denied the motion is pertinent because it augments several points in his statement of decision: "[I]n this case, . . . the Court found and does find that the credibility of the plaintiffs who testified, not only the Schellinger Brothers but their [*sic*] son Scott's testimony about what they lost as a result of their efforts to make this project happen and what they lost as a result of defendant Cotter's transgressions with respect to the contract . . . were such that the Court found those claims credible, found their description of their losses credible, and while they may have referred to summaries and documentation to refresh their recollection of their losses, it wasn't the documents in this Court's view that they were relying on, they were relying on what their losses were that they knew that they had suffered that came out of their pocket, . . . that they were very much aware of as the years went by. [¶] And certainly the testimony throughout the trial, all the evidence . . . with all of the expenses and the time and the delays and the efforts, that had apparently all gone for naught, and that played a huge part in this Court's consideration. It was their credibility. The credibility was impeccable in the Court's view, and in addition to everything else and all of the other considerations . . . played an extremely important part and continues to."

Next, assuming a legal duty was correctly identified by Judge Daum, there is insufficient evidence to establish that he, Cotter, breached it. Then, if there was a duty and he did breach it, the damages award should be overturned because Judge Daum applied an incorrect standard for measuring damages, and erroneously concluded that any damages were foreseeable or proximately caused by Cotter's breach. Finally, Cotter tells us "there is no substantial (or admissible) evidence supporting *any* award of damages to Schellinger *whatsoever*." (Italics added.)

### The Subdivision Map Act

Cotter frames the first issue in his brief as follows: "Schellinger could not unilaterally waive the final subdivision map condition. The finding he [*sic*] could contradicts the express terms of the contract and renders it illegal and void in violation of the Subdivision Map Act." (Bold type and underscore omitted.) Cotter argues that that statute "generally prohibits the sale, lease, or financing of any parcel of a subdivision until the recordation of an approved map in full compliance" with it (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 999; see Gov. Code, § 66499.30), and contracts which allow for waiver of that compliance are illegal and void. (*Sixells, LLC v. Cannery Business Park* (2008) 170 Cal.App.4th 648, 653–654; *Black Hills Investments, Inc. v. Albertson's, Inc.* (2007) 146 Cal.App.4th 883, 893–894.) So, "[b]y interpreting the Contract to permit Schellinger to waive the Map Condition, the trial court rendered it an illegal and void contract." Cotter concedes he is only now raising this issue, but urges that we use our discretionary power to permit a change in the theory on which the case was tried because the issue is purely one of law not involving the need to resolve a conflict in the evidence. We decline to exercise our discretion in Cotter's favor, for a number of reasons.

First, we disagree that the issue is purely legal. While it is true, as Cotter states, that the recitals in the original contract referred to the Subdivision Map Act, by the time of Judge Chouteau's decision in *Schellinger II* the terms of the original contract hardly governed the relationship between the parties. And contrary to Cotter's conclusory

12

statement that no extrinsic evidence was introduced on any Subdivision Map Act issue,[11] Schellinger notes that evidence extrinsic to the contract was received at trial "establishing Cotter's obligation to obtain the LLA [Lot Line Adjustment] which was disputed and outside the written agreement"—evidence we understand that could impact the Map Act issue. In Schellinger's words, "the heart of this case—the modification of the purchase agreement based upon over 15 years of events, and intent of the parties—is subject to the substantial evidence standard."

We mention the above not to establish what standard of review we apply to the issue, but rather to show how Cotter's failure to raise the issue below precludes him from raising it now. As the Supreme Court has observed, the rule against changing the theory on which a case was tried "is to be stringently applied when the new theory depends on controverted factual questions whose relevance thereto was not made to appear at trial." (*Bogacki v. Board of Supervisors* (1971) 5 Cal.3d 771, 780.)

Second, it does not positively appear that Judge Daum actually ruled that on the Subdivision Map issue in the way Cotter believes. To repeat, the relevant language in the statement of decision was: "It was apparent to [Schellinger] that the 2 year limitation would be insufficient, and they began to consider their option of simply waiving that requirement. The Court finds specifically that it was theirs to waive under traditional contract law and the terms of the original agreement, since the obtaining of the Map would inure solely to their benefit and going through without it put only the Schellingers, not Cotter, at risk." The word "it" in the second sentence may be read to encompass merely "the 2 year limitation" fixed in *Schellinger II* as the antecedent subject, with no reference to compliance with the Subdivision Map Act. Again, proving a different meaning to the word "it" would obviously move us away from a pristine question of law.

Third, Cotter never asked Judge Daum for clarification of the nature of the reference in the statement of decision to the Subdivision Map Act. One of the reasons for

---

[11] Cotter asserts that "[n]o witness testified about the intent of the parties regarding the Map Condition, or who was the intended beneficiary of that condition. The court considered only the Contract terms—an exercise that must be reviewed *de novo* here."

13

the theory of trial preclusion is the manifest unfairness of attributing something to the trial court that was never intended. (See *Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1351, fn. 12 and authorities cited.) A reviewing court will hesitate to put words in a trial court's mouth, particularly if those words amount to reversible error. Such hesitation is doubled if the reversible error is giving judicial enforcement to an illegal contract.

Fourth, there are a number of factors reflective of the unusual circumstances of this entire dispute. Cotter's attorney expressly argued to Judge Daum that the issue of waiving the Subdivision Map Act belonged to Schellinger, which did not timely raise it for the trial. Or, as Cotter's counsel put it in closing argument, any issue of waiver has "not been argued and it's not been based on evidence." Indeed, the issue of Schellinger's noncompliance with the Subdivision Map Act was not among the *53* affirmative defenses set out in Cotter's answer. In sum, the lesson we take from the totality of the circumstances is that this appeal is simply way too late in this protracted dispute to add a new issue.

### Breach

Concerning the general issue of whether he breached the agreement, and under the general caption of "There Is No Substantial Evidence to Support The Finding Cotter Breached the Contract," Cotter puts forth the following arguments: (1) "Cotter did not anticipatorily breach the contract"; (2) "Schellinger did not tender"; (3) "Cotter did not breach the contract by failing to obtain the Lot Line Adjustment" because (a) "Schellinger had the duty to obtain the Lot Line Adjustment—not Cotter," and (b) "Even if Cotter had a duty to obtain the Lot Line Adjustment, there is no substantial evidence he breached that duty resulting in damage to Schellinger"; and (4) "The trench issue cannot support a finding of waste, nor support the court's award of damages." Cotter is comprehensively incorrect.

The merest comparison of the briefs demonstrates that Cotter is in conspicuous noncompliance with an elemental principle of appellate practice, namely, that a party challenging the sufficiency of the evidence to support a factual determination made by

14

the trier of fact is *required* to set out *all* evidence pertinent to that determination, on penalty of forfeiting review. (E.g., *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) It is not the first time Cotter has ignored the principle. He made similar arguments in *Schellinger II*. Our response was as follows:

"[W]e presume the record contains sufficient evidence to sustain every factual determination made by Judge Chouteau, and it is Cotter's burden, as the appellant, to demonstrate that this presumption is unsound. (E.g., *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) [¶] Cotter makes only a token effort to shoulder this heavy burden. He does cite to some favorable testimony in his brief, but the most cursory comparison with Schellinger's brief demonstrates just how much was left out. ' "A claim of insufficiency of the evidence . . . consisting of mere assertion without a fair statement of the evidence, is entitled to no consideration when it is apparent . . . that a substantial amount of evidence was received on behalf of the respondents. Instead of a fair and sincere effort to show that the trial court was wrong, appellant's brief is a mere challenge to respondent's to prove that the court was right. . . . An appellant is not permitted to evade or shift his responsibility in this manner." ' (*Grand v. Griesinger* (1958) 160 Cal.App.2d 397, 403.) Schellinger met Cotter's challenge, but the disparity in evidentiary summaries is so great that we summarily reject Cotter's attempt to persuade us that substantial evidence does not support Judge Chouteau's finding . . . ." (*Schellinger II*, at p. 11.)

Although Cotter does cite to some of the evidence received by Judge Daum, the references are nowhere near complete. For example, Sebastopol City Engineer Susan Kelly's testimony was cited by Judge Daum in connection with what Judge Daum termed "the excavation problem," but her sole appearance in Cotter's brief is in connection with the lot line adjustment issue. Not at all discussed are City Manager and City Attorney Lawrence McLaughlin, Regional Board senior environmental scientist Stephen Bargsten, or Dr. Michael Josselyn, who testified as an expert on environmental mitigation. (Josselyn is referred to once, not by name, but simply as "Schellinger's expert.") Mr. Ruffino's sole appearance in Cotter's opening brief is to be quoted in the statement of

15

decision.  There is no mention of the testimony of Kenneth Cavin, who at different times worked for both parties on the property, and who prepared Schellinger's lot line adjustment application that would have been submitted to the City if Cotter hadn't refused to sign it.  Most glaringly, Cotter makes only three citations to his own testimony.  This is systematic evasion and omission.  As this is the second time it has occurred, there is no reason to exempt Cotter from strict application of the forfeiture rule.

In addition, and as a separate ground for our decision, if the point had been preserved for review, Cotter would also lose on the merits.  We emphasize that if what follows appears truncated, it is because we do not want to extend our discussion beyond establishing the substantial evidence that supports Judge Daum's judgment, his express findings, and whatever findings that may be implied from the statement of decision in support of the judgment.  (*Kulko v. Superior Court* (1977) 19 Cal.3d 514, 519, fn. 1; *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531; *SFPP v. Burlington Northern & Santa Fe Ry. Co*. (2004) 121 Cal.App.4th 452, 462.)

What Cotter calls the trench issue—and which obviously refers to the work done by contractor Ruffino in 2012—is dispositive.

As already noted, Cotter agreed not to "permit any act of waste or act that would tend to diminish the value of the Property for any reason."  (See fn. 4, *ante*.)  The agreement does not define "waste," the clear implication being that it was familiar to Schellinger and Cotter, both of whom were impliedly found by Judge Daum to be parties with considerable experience in the field of developing commercial property.[12]

Cotter views the notion of waste as simple and straightforward.  In his words: "Judge Daum never found the trench issue to constitute waste that could constitute a

_____

[12] There is some further mention of waste in the appendix to the agreement, which defines the term "hazardous substances" to include:  (1) "hazardous waste" and "solid waste" as defined by federal authorities, in specified federal statutes "or under any other Environmental Law;" (2) whatever "substances, materials, and wastes that are or become regulated or classified as hazardous or toxic under federal, state, or local laws or regulations;" and (3) any "material, waste, or substance" containing or constituting petroleum, asbestos, PCBs, or "a flammable explosive."

16

breach of Section 15(b) of the Contract. . . . Such a finding would be legally erroneous, and could not support a damages award of $2,855,431.77. [¶] Waste occurs only when the injury to real property is 'sufficiently substantial and permanent.' (*Avalon [Pacific—]Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC* (2011) 192 Cal.App.4th 1183, 1215.) 'Waste will [be] found only when the market value of property is permanently diminished or depreciated.' (*Smith v. Cap Concrete, Inc.* (1982) 133 Cal.App.3d 769, 777.) Here, there was no evidence of permanent damage. At worst, the trench was a problem costing $225,000 to fix, with five years of monitoring. Moreover, there was zero evidence of diminution of value. No witness attempted to value the property before/after the trench issue. Schellinger declined to offer an expert on property value. No value opinion was offered by Mr. Cotter, the only witness who could have. (Evid. Code § 813.) Having failed to prove diminution of value, Schellinger can recover nothing."

It seems clear from the context that by using the word "waste" the parties intended to adopt the broad concept ordinarily attributed to Civil Code sections 818 and 2929 and Code of Civil Procedure section 732, as any act or omission on the part of Cotter which would substantially impair the utility or value of the property to be conveyed to Schellinger. But the concept is considerably broader—and more subtle—than Cotter portrays. The two decisions quoted by Cotter help in proving the point.

In the first, the Court of Appeal stated: " ' "[W]aste is conduct (including in this word both acts of commission and of omission) on the part of the person in possession of land which is actionable at the behest of, and for protection of the reasonable expectations of, another owner of an interest in the same land. . . ." ' "[13] (*Avalon Pacific—Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC*, *supra*, 192 Cal.App.4th 1183, 1211, quoting *Cornelison v. Kornbluth* (1975) 15 Cal.3d 590, 597–598.) The

---

[13] Cotter does not dispute that Schellinger possessed an equitable interest in the property through its contract of purchase. (E.g., *Miller & Lux v. Batz* (1904) 142 Cal. 447, 451; *Jackson and Thomas v. Torrence* (1890) 83 Cal. 521, 537; *Southern Pacific Land Co. v. Kiggins* (1930) 110 Cal.App. 56, 60.)

17

defendant must be " 'under a duty to preserve and protect the property involved.' " (*Id*. at p. 1212; see *Hickman v. Mulder* (1976) 58 Cal.App.3d 900, 908 [willful mismanagement and neglect to do acts necessary to preserve property amount to bad faith waste].)

The circumstances of the second decision cited by Cotter, *Smith v. Cap Concrete, Inc*., *supra*, 133 Cal.App.3d 769, are particularly instructive. There, more than 60 truckloads of "broken concrete material" was dumped on the property. "[T]he agreed cost of removal of the concrete material was $6,000." The owner sued the concrete company. The case was tried on stipulated facts to the bench, which ruled against the owner. (*Id*., at p. 773.) Division One of this district reversed, concluding that "[w]hile loss of market value is the ultimate test [citation], it is a measure which will be applied flexibly," it will admit of " ' "the possible exception of a few instances," ' " "having in mind the 'quantity or quality of the estate, the nature and species of property, [and] the relation to it of the person charged to have committed the wrong.' " (*Id*. at pp. 777, 775, 777.) "[I]t is enough that [defendant's] conduct reduced the value of the subject property . . . . The damage we discern is palpable. Depreciation of the market value of the property in its present condition can easily be inferred from the stipulated facts." (*Id*. at pp. 777–778.)

In addition to the facts on the ground, Cotter's mental state may be of consequence. Our Supreme Court noted there may be instances of "waste committed in bad faith," where the plaintiff may point to the defendant as a "reckless, intentional, and . . . even malicious despoiler[] of property," causing damage that is unrelated to financial fluctuations in the economy at large. (*Cornelison v. Kornbluth*, *supra*, 15 Cal.3d 590, 604.) Yet proof of an overt destructional urge is not required. (See *Fait v. New Faze Development, Inc*. (2012) 207 Cal.App.4th 284, 299 ["we do not understand the *Cornelison* decision to conclude that *only* such 'despoilers of property' can be liable for 'bad faith' waste," "defendants may have had the best of intentions, but that . . . does not entitle them to escape liability for waste"], 300-301 [" 'bad faith' waste under *Cornelison* is any waste that is *not* the result of the economic pressures of a market

18

depression"].)  As with ordinary non-bad faith waste, simple but intentional passivity can suffice.  (*Nippon Credit Bank v. 1333 North Cal. Boulevard* (2001) 86 Cal.App.4th 486, 493–495 [failure to pay property taxes]; *Osuna v. Albertson* (1982) 134 Cal.App.3d 71, 75 [same]; *Hickman v. Mulder*, *supra*, 58 Cal.App.3d 900, 909 ["many occasions of waste arise because of *inaction* . . . .  [T]he failure to do what is needed can . . . be described . . . as willful"].)[14]

Whether the defendant acted in bad faith "is within the province of the trier of fact to determine . . . subject to review under the established rule of appellate review" (*Cornelison v. Kornbluth*, *supra*, 15 Cal.3d 590, 604; see *Fait v. New Faze Development, Inc.*, *supra*, 207 Cal.App.4th 284, 296; *Hickman v. Mulder*, *supra*, 58 Cal.App.3d 900, 909), meaning it would be a question of fact reviewed for substantial evidence.

We cannot agree that Judge Daum failed to identify Cotter's authorizing the digging of the trench as a material breach.  That matter clearly occupies pride of place among the discussion of Cotter's various efforts to sabotage the contract with

[14] The only mention of property taxes in the original agreement between Cotter and Schellinger concerned how they were to be prorated at the close of escrow. Thereafter, in the "Contract Supplement/Addendum No. Two" executed in September 2000, the parties agreed:  "Because the close of escrow has been delayed by a lengthy subdivision approval process, the Buyer agrees to pay the Seller's real estate taxes on the above properties (land portion only) for the period beginning June 22, 1998 and ending June 22, 2001 in the amount of $25,400.  Buyer shall immediately deposit $25,400 into the existing escrow [account] . . . and immediately release said sum to the Seller." The obvious purpose of this provision was to clear up the arrearages mentioned by Judge Daum.

However, Judge Daum also concluded that Schellinger continued to pay Cotter's property taxes for the next decade (eventually totaling about $128,000), even though there was no contractual obligation to do so.  Cotter testified that one of the aims behind a 2005 letter he sent to Schellinger (see fn. 2, *ante*) was "to put pressure on them [i.e., Schellinger] to do the taxes."  The obvious inference is that Schellinger paid the taxes because Cotter would not.  Wholly apart from any other factor, Cotter committed waste for each year he did/would not pay the assessed ad valorem taxes on the parcels. Although Judge Daum laid no particular emphasis on this point, the evidence on it was uncontradicted, and thus the conclusion that Cotter allowed waste appears as a matter of law.  This conclusion is consistent with Judge Daum's ultimate decision, and by itself constitutes a basis for affirming the judgment.

Schellinger, meriting not only a separate section of the statement of decision ("The Excavation Problem"), but reiteration under the discussion of "Remedy." In light of the sheer amount of space it occupies in the statement of decision, it is inconceivable that Judge Daum treated it as anything other than a breach. It does not have to be the sole, or most significant, breach. It can be one of several, so long as it is material. Judge Daum clearly viewed it as such. It is that conclusion to which we now turn.

Whether a breach is material is usually left to the trier of fact "to determine from all the facts and circumstances shown in evidence." (*Smith v. Empire Sanitary Dist.* (1954) 127 Cal.App.2d 63, 73; see *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.* (1987) 195 Cal.App.3d 1032, 1051–1052 and authorities cited.) As already noted, the defendant's mental state can be among those circumstances. (*Cornelison v. Kornbluth, supra*, 15 Cal.3d 590, 604; *Smith v. Empire Sanitary Dist., supra*, 127 Cal.App.2d at p. 73, citing Rest., Contracts, § 275 ["The willful, negligent or innocent behavior of the party failing to perform" is "influential" in determining materiality]; Rest.2d. Contracts, § 241 ["the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing" is "significant" in determining materiality]) So can the timing of the breach. (*Asso. Lathing etc. Co. v. Louis C. Dunn, Inc.* (1955) 135 Cal.App.2d 40, 49–50.) All we have to do is determine whether there is substantial evidence to support Judge Daum's implied finding that what Cotter did in connection with the trench constituted a material breach of his contract with Schellinger.

Cotter's bad faith was a recurring theme of the statement of decision. It went far beyond his simple refusal—we cannot believe it was financial inability—to pay the taxes on the property for 13 years, which alone is sufficient to establish waste. (*Nippon Credit Bank v. 1333 North Cal. Boulevard, supra*, 86 Cal.App.4th 486, 493; *Osuna v. Albertson, supra*, 134 Cal.App.3d 71, 75.) Judge Daum noted Cotter's "recalcitrance" in refusing to assist in securing the lot line adjustments. Twice Cotter took steps completely at odds with his obligations to Schellinger: first when he negotiated to sell the property to Mr. Tuxhorn, and second when he offered to give the property to the City. The latter drew

20

Judge Daum's condemnation as a "scheme," one that was in such "complete derogation of any rights of [Schellinger] and utterly without regard to the contract for sale of the subject property" that it "bordered on the unconscionable." And indeed it did, for it is the most elemental implied covenant to a contract for sale that the seller will not thereafter convey the object of the contract to another. (See *Brown v. Superior Court* (1949) 34 Cal.2d 559, 564–565 ["In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement. [Citations.] Where the parties contract to make a particular disposition of property . . . the agreement necessarily includes a promise not to breach the contract by . . . failing to dispose of the property as agreed."]; 1 Miller & Starr, Cal. Real Estate (4th ed. 2015) §§ 1:66–1:67, pp. 1-217–1-218, 1-233–1-234.)

Judge Daum also had a negative opinion of "Cotter's overall credibility" based on what he learned during the course of the trial. By contrast, the Schellinger evidence was deemed credible, and its actions were repeatedly characterized as "reasonable."

The timing of Cotter's dispatch of Ruffino to the property was, from Schellinger's perspective, especially harmful. Summoning Ruffino to the project in late January 2012—a time unquestionably prior to the termination deadline of June 2013 fixed by Judge Chouteau—Cotter pointed out the problem, which Ruffino at his deposition termed "a big freaking mess," as to which Cotter "instructed me to . . . dig a trench where the water would drain out." Ruffino estimated it would take a crew of least four workers a week to fix the problem, at an estimated cost of $20,000. Ruffino's crew started work on January 27.

Cotter's motive may be open to question, but the consequences are not.[15] The uncontroverted testimony was that the trench was approximately four feet wide, 200 feet

---

[15] By "motive" we are here referring to the reason Cotter directed Ruffino to perform certain work at the site. An additional "motive," which clearly did factor into Judge Daum's negative opinion of Cotter's veracity, was Cotter's threat to Ruffino to "come at me with everything that he's got" if Ruffino did not testify at his deposition "[t]hat I didn't dig the trench down there on the property." There was also evidence that

21

long, and encroached into a protected wetlands area. Because of this encroachment, in July 2012 the Regional Board issued a draft abatement order and a proposed "cleanup" plan.[16] Cotter was ordered to "[s]ubmit a work plan . . . that describes and shows in detail how [he] propose[s] to restore wetland functions . . . . The plan shall contain: . . . an engineering and biological design for all wetland restoration components; a time schedule for restoration activities; . . . and a monitoring proposal to evaluate whether the restoration is successful." Cotter's counsel wrote that "It is Mr. Cotter's intention to cooperate with the public agencies that have jurisdiction over the matter." But Cotter never submitted a plan.

By the time of trial, the Regional Board had made a final abatement order and imposed its own remediation plan. That order recites that when "staff inspected the Site again on July 11, 2013" "[they] expected to see that work had been done at the site to apply erosion control management best practices, as . . . had been discussed. There was no visual evidence that erosion control efforts or best management practices had been implemented . . . , and staff observed additional erosion within the area of . . . trenching" that had destroyed or damaged wetlands by "altering the conditions that supported wetland hydrology."

---

Cotter did not pay Ruffino, and that he ignored repeated inquiries from City officials attempting to confirm that Ruffino had acted at Cotter's direction.

[16] The Regional Board is one of the entities entrusted with enforcement of the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.), including "the prevention and abatement of water pollution," and discharges of "waste." (*Id*., § 13225, subds. (a) and (b).) (We hasten to add that the definition of "waste" in the context of that statutory scheme (see *id*., § 13050, subd. (d)) is completely consistent with the more widespread and common use concept than the arcane concept we are considering here.) However, the Regional Board construes this definition to include "sediment . . . discharged [in]to waters of the state." The Regional Board may require that any person being investigated "shall furnish, under penalty of perjury, technical or monitoring program reports" (*id*., § 13267, subd. (b)(1)), and may also order that person to "clean up . . . or abate" the problem, including to "take other necessary remedial action"(*id*., § 13304, subd. (a)).

According to Dr. Josselyn, the remediation process is complex: typically, "it's a planning process, a permitting process[, an] . . . implementation process and then a monitoring process," which can take 18 to 24 months. This would be followed by "a lengthy compliance period," "that . . . most often is a five-year period" at a minimum. "[I]f you haven't met the conditions at the end of five years, you need to undertake some remediation." The Regional Board may "require mitigation beyond what [is needed] to replace the area that was disrupted," such as "creation of more wetlands than what was . . . impacted." More particularly to this case, "by filing a clean up and abatement order, . . . there's a whole set of rules that come into play that the Regional Board can then implement in terms of ordering the clean up." The wording of the Regional Board's order suggested to Dr. Josselyn that "already the Board is recognizing there's some impacts that [go] beyond simply a restoration and may require additional wetlands to be created." Dr. Josselyn testified "in my experience, [the Regional Board] can request two-to-one mitigation for impacts to waters," meaning, "if it's 200 yards of wetlands that were disrupted by this ditch they may require 400 yards of wetlands to be provided to mitigate." Dr. Josselyn—who had worked on preparing the EIR for the City—testified that not only would the EIR have to be redone, but that the City would defer all action on the Schellinger's pending application until the Regional Board issued a "closure letter" following "completion of the work that was ordered by the board." In that sense, the consequences of the trenching ordered by Cotter had truly frozen further action on Schellinger's application to develop the property.

According to Dr. Josselyn, an additional point of potential aggravation was Cotter's failure to respond when the impropriety of Ruffino's trenching was brought to his attention: "In this particular case, we wouldn't know what the board may require because of the failure to act in the initial time that the owner was contacted." However, Dr. Josselyn did expect that the Regional Board would be "very strict" in enforcing compliance with its order. Dr. Josselyn estimated the likely costs for the process on Cotter's property to be approximately as much as $265,000. This figure did not include possible fines.

So, while the contract was still in force, Cotter was under a duty to preserve the property for transfer to Schellinger. (*Avalon Pacific—Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC*, *supra*, 192 Cal.App.4th 1183, 1211–1212; *Hickman v. Mulder*, *supra*, 58 Cal.App.3d 900, 909.) Instead of doing so, Cotter's unilateral action set in train a series of events that made it impossible for Schellinger to get what it bargained for, at least by the time of the contract's expiration date of June 2013 fixed by Judge Chouteau. Indeed, the likely period of Regional Board oversight would be a minimum of six years, through 2018. Cotter's unilateral action had effectively put a cloud on the property concerning what could be done with it until the Regional Board released its hold. Given Cotter's experience as a property developer and as California-licensed general contractor, a claim of ignorance for obtaining a permit could not be entertained. What remains is what appears to be the almost willful destruction of the purpose of the contract, extinguishing any utility of the contract to Schellinger. In short, Cotter wrecked the project for Schellinger.

Judge Daum could certainly treat that virtual destruction as a substantial impairment of the property's value. The damage was not permanent in the literal sense, but it was more permanent than the concrete rubble in *Smith v. Cap Concrete, Inc.*, *supra*, 133 Cal.App.3d 769, which could be removed at any time. Here, the property is impaired until the Regional Board says otherwise. Certainly Cotter's "conduct reduced the value of the subject property" (*id*., at p. 777) were it to be acquired subject to that restriction. Together with Cotter's demonstrated instances of bad faith and his nonpayment of taxes, Judge Daum could readily conclude that Cotter had breached the contract by committing waste, in violation of his agreement with Schellinger. (Cf. *Bewick v. Mecham* (1945) 26 Cal.2d 92, 99 ["A party who prevents fulfillment . . . of his own obligation commits a breach of contract"].) He could just as readily conclude that this breach was a material one because it entailed the virtual and volitional destruction of the subject of the contract.

24

(*Superior Motels, Inc. v. Rinn Motor Hotels, Inc.*, *supra*, 195 Cal.App.3d 1032, 1051–1052; *Smith v. Empire Sanitary Dist.*, *supra*, 127 Cal.App.2d 63, 73.)[17]

Something periodically restated by our Supreme Court seems almost designed with this case in mind:  " 'A party to a contract cannot take advantage of his own act or omission to escape liability thereon.  Where a party to a contract prevents the fulfillment of a condition or its performance by the adverse party, he cannot rely on such condition to defeat his liability.' "  (*Nelson v. Reisner* (1958) 51 Cal.2d 161, 171; accord, e.g., *Pacific Venture Corporation v. Huey* (1940) 15 Cal.2d 711, 717; *Wolf v. Marsh* (1880) 54 Cal. 228, 232.)

### Damages

Judge Daum awarded Schellinger damages of $2,855,431.77.  This figure derived from Schellinger's exhibit Nos. 34 and 35.  Headed "Job Cost Journal" for Laguna Vista, each is a computer-generated printout with a number of categories (e.g., "Property Tax" "Civil Engineering" "City/County Fees"), and hundreds of individual entries.  Schellinger overhead was included, but payroll was not.  Neither exhibit was itself admitted in evidence.  However, these exhibits were the basis for the testimony cited by Judge Daum.

Scott Schellinger is the son of William Schellinger.  (See fn. 1, *ante*.)  He testified that he had been "involved in the Laguna Vista Project" from the day he first started working for the family firm in 2001, that he "was actually hired at least in part to manage this project."  Among his responsibilities—and his alone—were taking over for his father the duty of "keeping track of what the costs have been [on] this . . . project."  "I manage the invoices as they come into the office.  I approve or question them.  Then they go to the accounting department.  They're entered into the computer system if they're valid.  The checks are cut."  Exhibit 35 "represents all the invoices that I approved from the time I started working on the project."  Prior to testifying, Scott Schellinger reviewed the

---

[17] Because Cotter was in material breach of the contract, Schellinger was excused from its duties of performance (e.g., *De Burgh v. De Burgh* (1952) 39 Cal.2d 858, 863; *Hale v. Sharp Healthcare* (2010) 183 Cal.App.4th 1373, 1387), thus making the issue of tender immaterial and academic.

figures for accuracy so that he could state under oath that exhibit 35 was an accurate reflection of the costs associated with the project that have been paid by Schellinger since he took over responsibility for the project.[18]

Both exhibits 34 and 35 were prepared by Scott Schellinger. In response to an unsuccessful objection by Cotter that Scott Schellinger's testimony lacked foundation "in light of the fact they testified they have these documents and chose not to bring them" to court, Schellinger's counsel elicited the reason why: Schellinger did indeed still have possession of "the documents that are related to the invoices and payments for the billing that shows up on Exhibits 34 and 35," "span[ning the] time from 1997 to the present," and filling 15 or 16 boxes when they were produced for Cotter at a deposition.

Exhibit 34 was the basis for the testimony of William Schellinger. It covered only the project costs from 1997 up to when Scott Schellinger took over in 2001. His testimony paralleled that of his son on the internal procedures for the figures set forth.

The bottom line on exhibit 34 was $146,331.20. The bottom line on exhibit 35 was $2,709,100.57.[19] Together they account for the damages award of $2,855,431.77.

According to Cotter, the award "cannot stand because: (1) the trial court applied the wrong measure of damages; (2) there is no substantial evidence that Schellinger's damages were proximately caused by Cotter's alleged breach; (3) there is no substantial evidence the damages awarded to Schellinger were foreseeable at the time of contracting;

---

[18] Scott Schellinger also prepared exhibit 30, which included expenses incurred before he began working on the project. After he had testified concerning the preparation of exhibit 30, Schellinger moved for its admission in evidence. Cotter objected on the ground of hearsay and because "there's also no foundation because some of the entry [*sic*] predate 2001." Judge Daum sustained "the objection," but with the proviso that his ruling "doesn't preclude consideration of further testimony by this witness as to the facts set forth in it, if they're from his personal knowledge." The following day William Schellinger testified about the newly prepared exhibit 34 and Scott Schellinger about the revised version of exhibit 30, now renumbered exhibit 35.

[19] When Schellinger moved for receipt of exhibits 34 and 35 in evidence, Judge Daum sustained Cotter's objections of "[h]earsay. . . . Also documents prepared for litigation."

26

and (4) there is no substantial (or admissible) evidence supporting any award of damages to Schellinger whatsoever." Each of these arguments is baseless.

Cotter states the award was "based *solely* upon the conclusory, oral testimony of Bill and Scott Schellinger who merely read a grand total from an inadmissible summary." At a later point in his brief, Cotter disparaged the testimony as "consist[ing] only of Bill and Scott Schellinger reading a total from an excluded summary of items they did not independently recall, but which was characterized as all 'cash out the door' relating to the project. Schellinger offered no evidence that each payment was properly recoverable as damages." Cotter continues: "By awarding Schellinger its total 'cash out the door' (without evidence of causation and foreseeability), the trial court went beyond the measure of damages for contract cases, and beyond the broader (and inapplicable) measure of damages for tort cases. (Civ. Code § 3333.) Rather, the trial court effectively awarded Schellinger the inapplicable 'out-of-pocket' measure of damages available for fraud under Civil Code section 3343." And several pages later, Cotter asserts in his brief: "Schellinger failed to offer admissible evidence of its damages. . . . [¶] Schellinger provided no evidentiary support to demonstrate any of that total number was attributable to expenses properly recoverable in this lawsuit. . . . [¶] Further, Schellinger provided only a total dollar amount without providing any detail, categorization, facts, or other support for the number." No authority cited by Schellinger "excuses its failure of proof" or "permits conclusory oral testimony." "Schellinger's testimony was not supported by *any* admissible documentary evidence."

There are several layers of erroneous reasoning in these statements.

First, Cotter is incorrect to state "Schellinger failed to offer admissible evidence of its damages." The unstated premise is that witnesses were merely uttering out loud the hearsay conclusions of exhibits 34 and 35. Cotter seems unaware that this is not the first commercial litigation that generated a lot of paper. California has an established and sensibly tolerant approach for such cases.

What was commonly known as the voluminous writing rule allowed admission of a statement or summary reflecting numerous accounts or documents " 'which cannot be

27

examined in court without great loss of time.' " (*Globe Mfg. Co. v. Harvey* (1921) 185 Cal. 255, 261 [quoting former Code Civ. Proc. § 1855]; accord, e.g., *San Pedro Lumber Co. v. Reynolds* (1898) 121 Cal. 74, 86; *Dallman Co. v. Southern Heater Co.* (1968) 262 Cal.App.2d 582, 595–596.) And that such a writing may itself be admissible appears still to be the rule. (see Evid. Code, § 1523, subd. (c); *Heaps v. Heaps* (2004) 124 Cal.App.4th 286, 293 ["since the schedule was a general compilation of documents that could not be examined individually by the court without great loss of time, it was admissible"]; cf. *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 749 ["the court admitted into evidence a handwritten itemization prepared by [testifying witness] Lee"]; Simons, Cal. Evidence Manual (2015) § 8:21, pp. 588–589).

But that is not a point that demands decision here, because Judge Daum did not admit exhibits 34 and 35 in evidence. What was received was oral testimony concerning the exhibits, as Judge Daum noted in the course of closing argument and again at the argument on the motions. As Judge Daum described on the latter occasion, "while they may have referred to summaries and documentation to refresh their recollection of their losses, it wasn't the documents in this Court's view that they were relying on, they were relying on what their losses were that they knew that they had suffered that came out of their pocket, that came out of their coffers that they were very much aware of as the years went by." (See fn. 10 and accompanying text, *ante*.) This is expressly admissible pursuant to Evidence Code section 1523, subdivision (d): "Oral testimony of the content of a writing is not . . . inadmissible . . . if the writing consists of numerous accounts or other writings that cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole." Both Scott and William Schellinger testified to his personal knowledge and authentication of the documents summarized in the exhibit he had prepared. (Evid. Code, § 1401.) Judge Daum did not abuse his discretion in receiving their testimony, which is substantial evidence for the amounts involved. (Evid. Code, § 411; *Greenwich S.F., LLC v. Wong*, *supra*, 190 Cal.App.4th 739, 767–768.)

With respect to the substantive point of recovery, there would be no dispute if this were a general breach of contract situation that would ordinarily use Schellinger's out-of-pocket expenses—commonly known as "reliance damages"—as a measure of damages under Civil Code section 3300. (See, e.g., *Buxbom v. Smith* (1944) 23 Cal.2d 535, 541; *Agam v. Gavra* (2015) 236 Cal.App.4th 91, 105–106; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 883, p. 970.) But this is not the ordinary situation, and, as we recently recognized, that general statute does not apply. (*Greenwich S.F., LLC v. Wong*, *supra*, 190 Cal.App.4th 739, 751.)

The parties have always agreed that the correct measure of damages is the specific rule established by Civil Code section 3306 (section 3306), which provides: "The detriment caused by the breach of an agreement to convey an estate in real property, is deemed to be the price paid, and the expenses properly incurred in examining the title and preparing the necessary papers, the difference between the price agreed to be paid and the value of the estate agreed to be conveyed at the time of the breach, the expenses properly incurred in preparing to enter upon the land, consequential damages according to proof, and interest."[20]

It will be appreciated at once that the situation where contractual performance hung fire for almost 15 years is about as atypical a situation as one is likely to see. Still, the very novelty of the setting does not mean that section 3306 is unable to authorize the damages awarded by Judge Daum with its language "expenses properly incurred in preparing to enter upon the land [and] consequential damages." Demonstrating this conclusion requires comparison of the concepts of general and consequential damages.

---

[20] The compilers of several leading practice guides believe there is authority supporting their conclusion that "When the buyer's damage claims are based on other duties or promises and are not the direct result of the promise to convey land, the specific damage limitations of [section] 3306 may not apply." (1 Cal. Real Property Remedies and Damages (Cont.Ed.Bar 2d ed. 2016) § 4.47, p. 4-70; Cal. Attorney's Guide to Damages (Cont.Ed.Bar 2d ed. 2015) § 2.10, p. 2-11.) As noted in the text, Schellinger has not attempted to remove itself from section 3306.

"Contractual damages are of two types—general damages (sometimes called direct damages) and special damages (sometimes called consequential damages). [Citations.] [¶] . . . [¶] General damages are often characterized as those that flow directly and necessarily from a breach of contract, or that are a natural result of a breach. [Citations.] Because general damages are a natural and necessary consequence of a contract breach, they are often said to be within the contemplation of the parties, meaning that because their occurrence is sufficiently predictable the parties at the time of contracting are 'deemed' to have contemplated them. [Citations.] [¶] . . . [¶] Unlike general damages, special damages are those losses that do not arise directly and inevitably from any similar breach of any similar agreement. Instead, they are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties. Special damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test). [Citations.] Special damages 'will not be presumed from the mere breach' but represent loss that 'occurred by reason of injuries following from' the breach." (*Lewis Jorge Construction Management, Inc v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 968–969.)

Section 3306 obviously reaches some clear instances of general damages in situations where specific performance is not ordered: (1) if paid by the buyer, the purchase price; (2) regardless of whether specific performance is ordered, any appreciation or depreciation of the property's value occurring by reason of the breach; (3) title and escrow expenses; (4) interest on these items; and (5) "expenses properly incurred in preparing to enter upon the land." The statutory language for the last item has only once been the subject of anything approaching judicial interpretation.

In *Crag Lumber Co. v. Crofoot* (1956) 144 Cal.App.2d 755 (*Crag Lumber*), the plaintiff bought unimproved land from the defendant for $31,250, intending to mill the timber on the acreage. The plaintiff spent $174,000 building a sawmill and "logging roads" on the property, and felled almost a million board feet of trees, all before

30

discovering that the defendant did not own the land he had purported to sell. The Court of Appeal held that the trial court had erred in awarding damages that included approximately $41,500 for depreciation of the mill and the cost of building the logging roads, stating:

"The trial court found that this item [the depreciation] was a cost for entry upon the land and also that the building of access roads to and into the land for the purpose of taking out timber from the land to the mill were costs expended in preparation for such entry. But these costs were not expenditures incurred in preparing to enter upon the land. They were expenditures made in accomplishing the general purposes for which the property was bought, that is, expended in the use of the land. The phrase 'to enter upon the land' refers to the taking of possession rather than to things done to put the land to general use. This land was timber land. Its highest and best use was for the marketing or manufacturing into lumber of the timber growing thereon. Nothing was expended in preparing to enter upon the land. The expenditures were made for the use of the land and that use continued for some time until, by reason of [defendant's] breach . . . possession was lost." (*Crag Lumber*, *supra*, 144 Cal.App.2d 755, 778–779.)

We agree with the *Crag Lumber* court that the phrase "to enter upon the land" refers to the taking of possession rather than the use of the property. But the crucial fact in *Crag Lumber*—which may account for its total absence from Cotter's brief, and, perhaps more surprisingly, from Schellinger's—is that the buyer there had actually taken possession of the property long before making the expenditures for the mill and roads, so they could not possibly have been found to have been made in preparing to enter upon the land. We further agree with *Crag Lumber* that the context of the contract may be dispositive. So it proves here.

It cannot be too often emphasized that the agreement between Cotter and Schellinger was not your run-of-the-mill contract for the sale of real property. It was a negotiated resolution between experienced parties, who were clearly aware of the ultimate intended use of the property. That goal was the commercial development of the merged parcels, with choice bits being reconveyed back to Cotter. Both Cotter and

31

Schellinger understood that no date could be specified with any assurance that the conditions for exchanging performances had been satisfied because so much was beyond their control. The agreement also accepted that there would be considerable dealings with local government, whose actions could not be put on a timetable. This explains the use of the open-ended escrow. The agreement further accepted that the dealings with the City of Sebastopol would be lengthy and handled by Schellinger, so lengthy that Schellinger agreed to keep Cotter "informed in writing . . . on a quarterly basis" of Schellinger's "progress" in "obtaining all approvals" for the project, while Cotter provided Schellinger with the power to "contact any federal, state, or local governmental authority or agency" concerning "any matters relating to the Property." Cotter also made Schellinger his " 'attorney in fact' to obtain the development approvals contemplated by this Agreement."

So, extensive interaction with local government was expressly contemplated by the parties. Hardly less explicit was the understanding that the costs of that interaction would be shouldered by Schellinger prior to taking formal possession at the close of the escrow. Those costs would not be present in the usual breach of a contract for the sale of real property, but they clearly would be in the context of this contract. Those costs would qualify as losses foreseeable by Cotter in the event of his breaching the agreement. (See *Lewis Jorge Construction Management, Inc v. Pomona Unified School Dist.*, *supra*, 34 Cal.4th 960, 969.) Accordingly, they could, and obviously in Judge Daum's decision did, qualify as both "expenses properly incurred [by Schellinger] in preparing to enter upon the land" and consequential damages allowed by section 3306.

We conclude that Schellinger made the "proper showing" for consequential damages under that statute, and produced substantial evidence that was credited by Judge Daum. (*Greenwich S.F., LLC v. Wong*, *supra*, 190 Cal.App.4th 739, 758, 767–768.) Our examination has established as a matter of law that Schellinger's losses were foreseeable and proximately caused by Cotter's breach. (See *Hedlund v. Superior Court* (1983) 34 Cal.3d 695, 705 ["Although foreseeability is most often a question of fact . . . when there is no room for a reasonable difference of opinion it may be decided as a question of

32

law"]; *Capolungo v. Bondi* (1986) 179 Cal.App.3d 346, 354 [same for causation]; cf. *Smith v. Cap Concrete, Inc.*, *supra*, 133 Cal.App.3d 769 [both issues apparently decided as a matter of law by reviewing court].)

## DISPOSITION

The judgment and the order are affirmed.  Schellinger shall recover its costs on appeal.

_____

Richman, J.

We concur:

_____

Kline, P.J.

_____

Miller, J.

A142201; *Schellinger Bros. v. Cotter*

Trial Court:   Sonoma County Superior Court

Trial Judge:   Hon. Elliot Lee Daum

Counsel:

Nossaman, Brendan F. Macaulay, Matthew J. Poole, for Defendant and Appellant.

Law Offices of Ethan A. Glaubiger, Ethan A. Glaubiger, for Plaintiffs and Respondents.